# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

MONICA MARIE MARTINEZ,
Defendant and Appellant.

S267138

Sixth Appellate District
H046164

Santa Clara County Superior Court
C1518585

August 24, 2023

Justice Kruger authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Groban, Jenkins, and Evans concurred.

PEOPLE v. MARTINEZ

S267138

Opinion of the Court by Kruger, J.

Since 1941, a Department of Insurance regulation has prohibited bail bond agents from entering agreements with jail inmates to be notified when individuals have recently been arrested and thus may be in need of bail bond services.  (Cal. Code Regs., tit. 10, § 2076.)  The Court of Appeal in this case held the regulation facially invalid under the First Amendment. The court concluded that the regulation imposes burdens on the speech rights of bail bond agents that are not adequately justified by the state's interests in deterring abusive bail solicitation practices.

We now reverse.  In invalidating the regulation, the Court of Appeal failed to consider the full range of interests at stake when a commercial bail bond agent engages the services of a jail inmate to gain private access to information about prospective clients.  The state's interests in stemming this practice are not solely — or even primarily — about the manner in which bail bond agents solicit clients.  The state's interests instead mainly concern the effects of these arrangements on sound jail administration and fair competition in the bail bond industry. Without foreclosing the possibility of as-applied challenges in other cases, we conclude the Court of Appeal erred in holding the regulation unconstitutional on its face.

## I.

## A.

When an individual is arrested and charged with a crime, bail may be set to help ensure the individual's appearance in court while allowing the individual to be released from jail in the interim. (See *In re Humphrey* (2021) 11 Cal.5th 135, 154 (*Humphrey*).)[1] To make bail, "an arrestee posts security — in the form of cash, property, or (more often) a commercial bail bond — which is forfeited if the arrestee later fails to appear in court." (*Humphrey*, at p. 142.)

"The vast majority of defendants who are released on bail in California rely on commercial bail bonds to secure their release." (Pretrial Detention Reform Workgroup, Pretrial Detention Reform: Recommendations to the Chief Justice (Oct. 2017) p. 9 <https://www.courts.ca.gov/documents/PDRReport-20171023.pdf> [as of August 24, 2023].)[2] A commercial bail bond is a written agreement in which a licensed surety guarantees the defendant's appearance in court and promises to pay the full bail amount if the defendant fails to appear. (*People v. Safety National Casualty Corp.* (2016) 62 Cal.4th 703, 709.) "Commercial bail bonds are underwritten and issued by licensed bail agents who act as the appointed representatives of licensed

---

[1] In *Humphrey*, we held that it is unconstitutional to detain defendants before trial solely because they lack the financial resources to make bail and that accordingly, "courts must consider an arrestee's ability to pay alongside the efficacy of less restrictive alternatives when setting bail." (*Humphrey*, *supra*, 11 Cal.5th at p. 152.)

[2] All Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.

surety insurance companies." (Pretrial Detention Reform, p. 29.) To obtain such a bond, the defendant (or someone acting on the defendant's behalf) pays the bail bond agent a nonrefundable premium for the service of providing the bond. (*Id.* at p. 30 [noting that the premium is typically 10 percent of the bail amount].)

Although the system of release on bail dates back centuries, the commercial bail bond industry is a relatively recent innovation, having first emerged in the latter part of the 19th century. (Baughman, The Bail Book: A Comprehensive Look at Bail in America's Criminal Justice System (2018) p. 164; see also, e.g., *Holland v. Rosen* (3d Cir. 2018) 895 F.3d 272, 293–294 [citing additional sources].) In California, the industry was unregulated for several decades, until reports revealed abusive practices that had become widespread among bail bond businesses across the state. Reports indicated, for example, that bail bond agents commonly entered kickback schemes with police officers to gain information about potential clients; in return for notifying bail bond agents of criminal arrests, police officers would take a share of the bond premium once the agents had secured the prisoners' release. (See, e.g., *Bail Broker Control Bill in Assembly*, Oakland Tribune (Mar. 30, 1937) p. 5.) Other reports indicated that bail bond agents would agree to steer the prisoners to certain attorneys, who would, in turn, split legal fees with the agents and police officers involved in the schemes. (See, e.g., *Bail Brokers Are Rapped As Bill Wins Okeh*, Sacramento Bee (Mar. 30, 1937) p. 13.)

These revelations prompted calls for reform and increased oversight over the burgeoning commercial bail industry. The Legislature responded by enacting the Bail Bond Regulatory Act of 1937, which established a framework for industry regulation.

(Stats. 1937, ch. 653, pp. 1797–1800; Stats. 1937, ch. 654, pp. 1800–1804; see *McDonough v. Goodcell* (1939) 13 Cal.2d 741, 743.) The Act requires every person engaged in the bail bond business to secure a license from the Insurance Commissioner. (See Ins. Code, §§ 1800, 1802.) The Act further vests the Insurance Commissioner with the authority to "make reasonable rules necessary, advisable, or convenient" for the regulation of bail licensees. (*Id.*, § 1812.)

In 1941, following further investigations into the bail industry, the Insurance Commissioner promulgated a slate of regulations governing the conduct of bail licensees. (Cal. Dept. of Insurance, Rules & Regulations Governing Bail Bond Transactions, Ruling No. 21 (Dec. 1, 1941) (Ruling No. 21).) Those regulations, many of which remain in force in substantially similar form today, prohibit bail licensees from, among other practices: engaging unlicensed persons to solicit or negotiate bail on the licensed agent's behalf (Cal. Code Regs., tit. 10, § 2068); entering bail agreements in advance of the commission of an offense or an arrest (*id.*, § 2070); referring arrestees to defense attorneys (*id.*, § 2071); soliciting bail in certain places, like jails and courthouses (*id.*, § 2074); and charging rates or fees that differ from those that appear in rate schedules that licensees must file with the Department of Insurance (*id.*, § 2082). (See Ruling No. 21, *supra*, ¶¶ 19, 23, 27, 35–36, 38.) Another later-added regulation prohibits bail bond agents from directly soliciting arrestees unless the agent has received a bona fide request for bail services from the arrestee or other specified individuals acting on the arrestee's behalf. (See Cal. Code Regs., tit. 10, § 2079.1; see *id.*, § 2079.)

The provision at issue in this case, California Code of Regulations, title 10, section 2076 (section 2076), was added as

part of the initial 1941 slate of regulations. (See Ruling No. 21, *supra*, ¶ 37.) Section 2076, as presently in force, provides in full: "No bail licensee shall, for any purpose, directly or indirectly, enter into an arrangement of any kind or have any understanding with a law enforcement officer, newspaper employee, messenger service or any of its employees, a trusty in a jail, any other person incarcerated in a jail, or with any other persons, to inform or notify any licensee (except in direct answer to a question relating to the public records concerning a specific person named by the licensees in the request for information), directly or indirectly, of:  [¶]  (a) The existence of a criminal complaint;  [¶]  (b) The fact of an arrest; or  [¶]  (c) The fact that an arrest of any person is impending or contemplated;  [¶] (d) Any information pertaining to the matters set forth in (a) to (c) hereof or the persons involved therein."[3] Section 1814 of the Insurance Code makes the violation of a rule promulgated by the Insurance Commissioner, including section 2076, an offense chargeable either as a misdemeanor or a felony.

## B.

In 2015, the Santa Clara County District Attorney charged defendant Monica Marie Martinez with seven felony counts of violating section 2076.[4]  The complaint alleged that on

---

[3]  The current regulation is essentially the same in substance as the version originally promulgated in 1941 (see Ruling No. 21, *supra*, ¶ 37), except that the original version did not include the public records exception, which was added in 1977 (Cal. Reg. Notice Register 77, No. 38 (Sept. 17, 1977) p. 1741).

[4]  In various places in the record, Martinez is also referred to as Monica Milla or Monica Marie Milla.  To remain consistent with the charging documents and the Court of Appeal's opinion, however, we will refer to her as Martinez.

seven different dates in 2014, Martinez "enter[ed] into an agreement and ha[d] an understanding with a person incarcerated in jail, to inform and notify defendant, a bail licensee, of the fact of an arrest." Martinez demurred. Among other things, she argued that section 2076 violates her right to freedom of speech under the First Amendment to the United States Constitution and article 2, section 2(a) of the California Constitution. The trial court overruled the demurrer. Martinez subsequently pleaded no contest to one of the counts in the complaint, and the prosecution agreed to dismiss the remaining six. The court suspended imposition of sentence and placed Martinez on probation for three years. The court also ordered that she serve four months in custody in the county jail, and it promised to reduce the offense to a misdemeanor if she successfully completed one year of probation. (See Pen. Code, § 17.)

Martinez appealed her conviction after obtaining a certificate of probable cause. (See Pen. Code, § 1237.5; Cal. Rules of Court, rule 8.304(b)(1).) On appeal, a divided court agreed with Martinez that section 2076 is facially unconstitutional and reversed the conviction. (*People v. Martinez* (2020) 59 Cal.App.5th 280, 290 (*Martinez*).)

At the outset, the Court of Appeal considered the applicable standard of constitutional scrutiny: whether section 2076 was subject to the strict scrutiny typically applicable to content-based speech regulations, as Martinez argued, or instead subject to the intermediate scrutiny applicable to commercial speech regulations, as the People argued. The court agreed with Martinez that the regulation was content-based but ultimately did not decide whether strict scrutiny applied because, in the court's view, the regulation failed even

intermediate scrutiny. (*Martinez, supra*, 59 Cal.App.5th at pp. 303, 305–307, citing *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York* (1980) 447 U.S. 557 (*Central Hudson*).) The court acknowledged that the People had identified substantial state interests underlying section 2076. The court cited, in particular, the state's interests in deterring bail bond agents from engaging in forms of arrestee solicitation prohibited by other provisions of California law. (*Martinez*, at pp. 307–311; see, e.g., Cal. Code Regs., tit. 10, § 2079.1 [prohibiting bail bond agents from directly soliciting arrestees who have not requested their services]; Pen. Code, § 160 [prohibiting agents from employing inmates to solicit arrestees on the agents' behalf].) But in the court's view, the People failed to adduce sufficient empirical or anecdotal evidence to show that section 2076 "*directly and materially* advance[d]" the state's interests in deterring unlawful solicitation practices, as intermediate scrutiny under *Central Hudson* requires. (*Martinez*, at p. 312 & fn. 14.)[5]

Justice Grover dissented. (*Martinez, supra*, 59 Cal.App.5th at p. 314 (dis. opn. of Grover, J.).) In contrast to the majority, which focused on the state's interest in deterring unlawful solicitation of arrestees, Justice Grover instead focused on the state's "substantial interest[s]" in "prevent[ing] unfair competition among licensed bail agents" and in

---

[5] Martinez also raised two other constitutional arguments: that section 2076 is unconstitutionally vague on its face and that it is unconstitutionally overbroad. The Court of Appeal rejected the first (*Martinez, supra*, 59 Cal.App.5th at p. 297), and, in light of its conclusion that section 2076 was an invalid content-based regulation, declined to address the second (*Martinez*, at pp. 290, 313). Martinez has not pressed either of these arguments before this court, and we express no view on them.

"maintaining professional and ethical standards." (*Id.* at p. 315 (dis. opn. of Grover, J.).) In Justice Grover's view, section 2076 directly advances those interests by "restricting bail licensees' access to . . . insider information" permitting "the wholesale identification of people with imminent bail needs." (*Martinez*, at p. 315 (dis. opn. of Grover, J.).) Justice Grover reasoned, "By restricting bail licensees' access to that insider information, the regulation directly prevents unfair competition among licensed bail agents. Restricting licensees' access to wholesale identifying information also directly advances the state's interest in protecting arrestees from intrusive conduct. Further, the regulation is not unduly restrictive in light of the state's interests, as it does not prohibit agreements to obtain public records regarding persons already known to and identified by a bail agent." (*Ibid.*) "Seeing no constitutional impediment to enforcing California Code of Regulations, title 10, section 2076," Justice Grover would have affirmed.[6] (*Martinez*, at p. 316 (dis. opn. of Grover, J.).)

We granted review to consider the issue.

## II.

## A.

Our first task is to define the scope of our review. By its terms, section 2076 prohibits notification arrangements involving a variety of different classes of informants with access to information about recent arrests, including law enforcement officers, newspaper employees, and others. The charges in Martinez's case, however, stem from just one type of arrangement, involving an informant who is a "person

---

[6] Justice Grover also would have rejected Martinez's vagueness and overbreadth challenges. (See fn. 5, *ante*.)

incarcerated in a jail." (§ 2076.) Martinez's argument does not focus specifically on such arrangements; her argument is that section 2076 is unconstitutional in all, or nearly all, its applications. But the Attorney General asks us to focus more particularly on notification arrangements with incarcerated persons, which, in his view, call for a different analysis than notification arrangements with, for example, police officers or newspaper reporters. The Attorney General accordingly urges us to treat Martinez's challenge as a "partial facial challenge[], or class or category-based as-applied challenge[]." (See *Mathews v. Becerra* (2019) 8 Cal.5th 756, 768 [employing a similar category-based facial analysis].)

For present purposes, it does not matter whether we characterize Martinez's challenge as a "partial" facial challenge or a "full" one. Either way, the fact remains that Martinez seeks relief that extends "beyond [her] particular circumstances," and she therefore must "satisfy our standards for a facial challenge to the extent of that reach." (*Doe v. Reed* (2010) 561 U.S. 186, 194.) To prevail on a facial challenge, litigants must show that the challenged rule creates constitutional problems in "at least ' "the generality" ' [citation] or 'vast majority' " of cases. (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 218; cf. *Reno v. Flores* (1993) 507 U.S. 292, 301 [noting that a facial challenge to a regulation is subject to the same standards as a facial challenge to a statute].) Here, Martinez advances no theory on which she could establish the invalidity of section 2076 in the generality or vast majority of cases without also establishing the invalidity of section 2076 as applied to the class of arrangements involving incarcerated

persons.[7]  Accordingly, regardless of whether we treat Martinez's claim as a "partial" or "full" facial challenge, she must show that the regulation's application to this class of arrangements is unconstitutional.  We therefore begin by analyzing whether section 2076 is valid as applied to the class of bail bond agents who, like Martinez, have entered prohibited notification arrangements with incarcerated persons; if it is, Martinez's challenge to the regulation as a whole cannot prevail.

**B.**

Our next task is to define the nature of our review. Martinez brings a challenge under the First Amendment, which protects rights of expression, including the right to share information.  (*Kleindienst v. Mandel* (1972) 408 U.S. 753, 762 [the First Amendment protects " 'the right to receive information and ideas' "]; *Sorrell v. IMS Health Inc.* (2011) 564 U.S. 552, 570 (*Sorrell*) ["the creation and dissemination of information are speech within the meaning of the First Amendment"].)

Martinez contends section 2076 infringes this right by prohibiting bail licensees from receiving information about arrestees.  Martinez's characterization of section 2076 is not quite accurate; the regulation does not, as she would have it,

---

[7]  This is because Martinez raises what we might call a "typical facial attack." (*United States v. Stevens* (2010) 559 U.S. 460, 472.)  In the First Amendment context, courts have recognized another " 'type of facial challenge,' whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.' " (*Stevens*, at p. 473.)  But as we have noted, Martinez does not press that sort of First Amendment overbreadth challenge in this court.  (See fn. 5, *ante*.)

directly forbid any particular exchange of information. Section 2076 instead forbids "arrangement[s]" (or "understanding[s]") between bail licensees and jail inmates (among others) to inform or notify the licensees about arrests, while expressly exempting information about particular arrestees that is sought or disclosed via public records requests. (§ 2076.) In other words, as the Court of Appeal correctly explained, the regulation forbids both formally binding contracts and less formal agreements to share arrest information. (*Martinez, supra,* 59 Cal.App.5th at pp. 298–299.) The regulation does not prohibit a bail licensee from seeking or receiving such information, "provided the information is not being conveyed pursuant to a prohibited arrangement or understanding" with an incarcerated person or other prohibited informant. (*Id.* at p. 306.) All the same, at least for purposes of this case, the Attorney General does not dispute that the prohibition on notification arrangements "implicates the First Amendment-protected rights of commercial bail agents," and we therefore assume without deciding that the regulation warrants scrutiny under the First Amendment.[8]

The next question concerns the standard of scrutiny we should apply in evaluating the constitutionality of the regulation. On this subject, Martinez and the Attorney General disagree sharply. While Martinez argues that section 2076 should be subject to strict scrutiny — the most exacting form of

---

[8] The Attorney General has not argued, and we thus do not address, whether the speech-related burdens of section 2076's prohibition on notification arrangements can be considered incidental to the state's regulation of commercial activity. (See *Sorrell, supra,* 564 U.S. at p. 567 ["[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech"].)

constitutional review — the Attorney General argues for a far less demanding standard appropriate to a regulation that applies to (1) commercial activity (2) in a jail setting. Collectively, the parties invoke essentially every possible standard of First Amendment review, ranging from the most demanding possible standard to the least. We address the two extremes before we turn to the intermediate standard the Court of Appeal applied in the decision below.

Emphasizing that this case concerns the class of prohibited arrangements involving incarcerated individuals, the Attorney General first argues that we should review section 2076 under the standard for reviewing constitutional challenges to jail and prison regulations set out in *Turner v. Safley* (1987) 482 U.S. 78. This standard is highly deferential; under *Turner*, courts generally must uphold such regulations if they are "reasonably related to legitimate penological interests." (*Id.* at p. 89.) The Attorney General asserts that section 2076 is reasonably related to multiple legitimate interests in sound jail administration and safety. For one thing, the Attorney General contends, the prohibited arrangements are typically compensated in cash or in kind, which allows inmates to profit from their incarceration by "steer[ing] business toward a particular bail bond firm."[9] The Attorney General argues that

---

[9] Martinez is correct that the payment of compensation is not a necessary element of a section 2076 violation. But the Attorney General notes, and common sense would also suggest, that a bail licensee's " 'arrangement' or 'understanding' " with a jail inmate to obtain information about recent arrests will often involve some form of consideration from the bail licensee, whether monetary or in kind. (See also Cal. Dept. of Insurance, Recommendations for California's Bail System (Feb. 2018) p. 6 [noting results of a multiyear investigation in Santa Clara

such business arrangements with outside commercial entities "erode the deterrent and retributive value of incarceration" — at least for those jail inmates who are serving sentences following conviction for a crime.[10]  For this reason, courts have long upheld restrictions on commercial activity inside prisons. (See, e.g., *French v. Butterworth* (1st Cir. 1980) 614 F.2d 23, 24 ["a prisoner has no recognized right to conduct a business while incarcerated"]; see also, e.g., *King v. Federal Bureau of Prisons* (7th Cir. 2005) 415 F.3d 634, 636 [citing cases]; *Stroud v. Swope* (9th Cir. 1951) 187 F.2d 850, 851 [prisoner had no constitutional right to conduct business concerning the publication of books he had authored].)

More generally, the Attorney General argues that business arrangements between bail bond agents and jail insiders can threaten jail security by "promot[ing] inmate rivalries and even violence."  The Attorney General cites a 2017 investigation by the Santa Clara County District Attorney's Office, which found that inmates involved in the prohibited arrangements would threaten or pressure other inmates to sign contracts with certain bail agents and would retaliate against inmates working for rival bail firms.  (See Lewis, *Inside Santa*

_____

County "uncovering schemes by bail agents to scoop business away from competitors by rewarding jail inmates with money added to their jail accounts for providing information about newly booked individuals in the jails"].)

[10]    Although pretrial detention arguably does not serve any retributive purpose, the Attorney General points out that jails in California also frequently house convicted inmates, who might be in a position to provide information about recently arrested pretrial detainees.  (See Pen. Code, § 4002, subd. (a) [authorizing jail to group together "persons . . . detained for trial [and] . . . persons convicted and under sentence" for certain purposes, including "supervised activities and . . . housing"].)

*Clara Jails, Predatory Bail Schemes Flourished for Years* (Apr. 10, 2017) KQED <https://www.kqed.org/news/11393155/inside-santa-clara-jails-predatory-bail-schemes-fluorished-for-years> [as of August 24, 2023].) The Attorney General also points to a 2014 report by the New Jersey Commission of Investigation finding that aggressive competition among inmates retained by competing bail firms created dangerous conditions within New Jersey correctional facilities, particularly when the bail firms recruited rival prison gangs to drum up business. (See State of N.J., Com. of Investigation, Inside Out: Questionable and Abusive Practices in New Jersey's Bail-Bond Industry (2014) pp. 12–13 <https://dspace.njstatelib.org/xmlui/bitstream/handle/10929/33879/i622014k.pdf> [as of August 24, 2023].) Given these dangers, the Attorney General argues, we should defer under *Turner* to the Insurance Commissioner's judgment that notification arrangements between jail inmates and bail bond agents should be prohibited.

Although the Attorney General is undoubtedly correct that section 2076 implicates matters of jail administration and security insofar as it applies to arrangements between bail licensees and incarcerated persons, it is not clear whether *Turner* supplies the right lens for viewing the constitutionality of the regulation. The rationale underlying the *Turner* test is based on the "considerable deference" owed "to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." (*Thornburgh v. Abbott* (1989) 490 U.S. 401, 408; *id.* at p. 407 [noting the "expertise of these officials" and emphasizing the need to "be[] sensitive to the delicate balance that [they] must strike between the order and security of the internal prison environment and the legitimate demands of

14

those on the 'outside' who seek to enter that environment" in some way].)  Section 2076 was not, however, promulgated by a prison or jail administrator; it was promulgated by the Insurance Commissioner as part of a broader slate of bail industry regulations directed at licensed bail bond agents.  The regulations do not directly target the conduct of inmates in any of their applications.  (As we have noted, the regulation prohibits bail bond agents from entering a variety of arrangements with both incarcerated and nonincarcerated persons — only some of which could directly affect the internal environment of the jail.)  It is questionable whether we should afford *Turner* deference to a regulation with these features.[11]  In

---

[11]  The Attorney General cites cases from other jurisdictions indicating that *Turner* deference is not exclusively reserved for the judgments of jail and prison officials and applies, for instance, to statutory jail and prison regulations enacted by legislatures.  None of the Attorney General's cases, however, involves circumstances comparable to this case, where the regulation in question was promulgated by a commercial regulator to govern the conduct of nonincarcerated commercial actors.  (Cf., e.g., *Mass. Prisoners Ass'n v. Acting Governor* (Mass. 2002) 761 N.E.2d 952, 955 [challenge to an executive order directing the state corrections department to prohibit political fundraising in state prisons, pursuant to a state statute]; *Waterman v. Farmer* (3d Cir. 1999) 183 F.3d 208, 211 [challenge to a state statute prohibiting access to " '[s]exually oriented material' " in a correctional facility for treatment of sex offenders, which the court construed in light of implementing regulations by the state corrections department]; *Amatel v. Reno* (D.C. Cir. 1998) 156 F.3d 192, 196, 202 [challenge to a federal statute banning use of Bureau of Prisons funds to distribute sexually explicit material to prisoners, which the court construed in light of implementing regulations by the Bureau of Prisons]; *Matthews v. Morales* (5th Cir. 1994) 23 F.3d 118, 119 [challenge to a state statute barring convicted felons from changing their names].)

any event, for the reasons that follow, it is unnecessary for us to do so now in order to take adequate account of the range of governmental interests implicated by the application of section 2076 to notification arrangements with persons incarcerated in a jail.[12]

Venturing to the opposite pole from deferential *Turner* review, Martinez argues that section 2076 should be subject to strict scrutiny because it regulates speech on the basis of its content. (See, e.g., *Barr v. American Assn. of Political Consultants* (2020) __ U.S. __, __ [140 S.Ct. 2335, 2346].) Under high court precedent, restrictions on speech are considered content-based if they "target speech based on its communicative content" — that is, "if a law applies to particular speech because of the topic discussed or the idea or message expressed." (*Reed v. Town of Gilbert* (2015) 576 U.S. 155, 163; see *City of Austin, Texas v. Reagan National Advertising of Austin, LLC* (2022) __ U.S. __, __ [142 S.Ct. 1464, 1471].) The parties do not dispute that section 2076 is content-based in this sense; to the extent

---

[12] Martinez also argues that *Turner* is inapplicable because it governs only the constitutional claims of convicted inmates and not the claims of pretrial detainees. Courts have not, however, generally distinguished between the two types of claims in applying the *Turner* test. (See, e.g., *Florence v. Board of Chosen Freeholders of County of Burlington* (2012) 566 U.S. 318, 330 [stating that the case, which involved searches of arrested persons held in jail pretrial, is "governed by the principles announced in *Turner*"]; *Bull v. City and County of San Francisco* (9th Cir. 2010) 595 F.3d 964, 974, fn. 10 (en banc) ["We have never distinguished between pretrial detainees and prisoners in applying the *Turner* test, but have identified the interests of correction facility officials responsible for pretrial detainees as being 'penological' in nature."].) In any event, we need not resolve that issue here; as explained below, we will assume without deciding that intermediate scrutiny applies.

section 2076 burdens speech, it does so on the basis of the topic discussed — namely, information concerning arrestees. As a general rule, the high court has held that noncommercial content-based restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." (*Reed*, at p. 163.) Courts engage in this demanding form of scrutiny "to ensure that communication has not been prohibited 'merely because public officials disapprove the speaker's views.' " (*Consolidated Edison Co. v. Public Serv. Comm'n* (1980) 447 U.S. 530, 536, quoting *Niemotko v. Maryland* (1951) 340 U.S. 268, 282 (conc. opn. of Frankfurter, J.); see also *Reed*, at p. 174 (conc. opn. of Alito, J.) ["Content-based laws merit th[e] protection [of strict scrutiny] because they present, albeit sometimes in a subtler form, the same dangers as laws that regulate speech based on viewpoint. Limiting speech based on its 'topic' or 'subject' favors those who do not want to disturb the status quo. Such regulations may interfere with democratic self-government and the search for truth."].)

There are, however, several exceptions to the general presumption that content-based restrictions are unconstitutional. (See, e.g., Fallon, *Sexual Harassment, Content Neutrality, and the First Amendment Dog That Didn't Bark* (1994) Sup. Ct. Rev. 1, 23; *Ralphs Grocery Co. v. United Food & Commercial Workers Union Local 8* (2012) 55 Cal.4th 1083, 1113–1114 (conc. opn. of Liu, J.).) Commercial speech constitutes one such exception. As the high court has explained, " 'commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values,' and is subject to 'modes of regulation that might be impermissible in the realm of noncommercial

expression.' " (*Board of Trustees, State Univ. of N.Y. v. Fox* (1989) 492 U.S. 469, 477.) Commercial speech restrictions — which not infrequently target speech based on its communicative content — are instead subject to " 'intermediate' scrutiny . . . under the framework set forth in *Central Hudson*[, *supra*, 447 U.S. 557]." (*Florida Bar v. Went For It, Inc.* (1995) 515 U.S. 618, 623.)

The Attorney General argues that if the prohibition on notification arrangements is not subject to deferential review under *Turner*, the regulation aims at speech that is inextricably bound up with traditional regulation of commercial activity and thus at most should be subject to intermediate scrutiny, not strict scrutiny. To the extent that section 2076 impinges on a protected speech right, we agree with the Attorney General that intermediate scrutiny is the more appropriate standard.

The Attorney General's argument in this regard relies heavily on cases addressing the contours of the commercial speech doctrine. As the Court of Appeal in this case correctly observed, this case differs from many of those cases in that it does not involve restrictions on advertising or solicitation — at least, not directly. (See *Martinez, supra*, 59 Cal.App.5th at pp. 304–305; see also, e.g., *Va. Pharmacy Bd. v. Va. Consumer Council* (1976) 425 U.S. 748, 761–770 [prohibition on advertising prescription drug prices]; *Central Hudson, supra*, 447 U.S. at pp. 563–566 [prohibition on promotional advertising by a utility]; *Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525, 553–554 [restrictions on the sale, promotion, and labeling of tobacco products]; *44 Liquormart, Inc. v. Rhode Island* (1996) 517 U.S. 484, 501–504 [prohibition on advertising liquor prices].)

But while the commercial speech doctrine has most commonly been applied to such restrictions, the doctrine is not so limited. "Although commercial speech is often described as 'speech proposing a commercial transaction' [citation], the high court has also referred to commercial speech more broadly as 'expression related solely to the economic interests of the speaker and its audience' (*Central Hudson, supra*, 447 U.S. at p. 561)." (*Beeman v. Anthem Prescription Management, LLC* (2013) 58 Cal.4th 329, 352 (*Beeman*).) Exploring the high court's guidance, we held in *Beeman* that the commercial speech doctrine applied to a law requiring prescription drug claims processors to transmit a report on pharmacy fees to their clients. (*Ibid.*) We explained that although the required report does not " 'propose[] a commercial transaction between the speaker . . . and its audience,' " that "does not necessarily mean the report is not commercial speech." (*Ibid.*) We cited several factors in support of the conclusion that the statute was, in fact, a commercial speech regulation. The statute, we explained, "operates in a commercial setting [and] prescribes a specific communication that a business entity must make to its clients"; the communication in question is "related to the economic interests of prescription drug claims processors and their clients"; and the communication is " ' " 'linked inextricably' " ' " to commercial transactions within the government's power to regulate " 'to prevent commercial harms.' "[13] (*Beeman*, at p. 352,

---

[13] Although we determined that the reports concerned only " 'commercial speech,' " we concluded that labeling them as such "does not dispositively determine" the applicable level of scrutiny. (*Beeman, supra*, 58 Cal.4th at p. 353.) We observed that the challenged law did not "impede the free flow of commercial information"; rather, the law enhanced the flow of

quoting *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 955.) Other courts have focused on similar factors to reach similar conclusions about laws operating outside the narrow context of marketing and advertising restrictions. (See, e.g., *Greater Philadelphia Chamber v. City of Phila.* (3d Cir. 2020) 949 F.3d 116, 136–137 [applying the commercial speech framework to a city ordinance prohibiting employers from inquiring into a prospective employee's wage history in the process of setting or negotiating that employee's wage]; see also *Yim v. City of Seattle* (9th Cir. 2023) 63 F.4th 783, 799–801 (conc. opn. of Wardlaw, J.) [concluding that a city ordinance prohibiting landlords from inquiring into the criminal history of current and prospective tenants regulates commercial speech]; *id.* at p. 809 (conc. & dis. opn. of Gould, J.) [agreeing that the regulated speech is commercial in nature].)

A related line of cases has applied an intermediate level of scrutiny, akin to a commercial speech inquiry, to regulations restricting sales of customer data. That line of cases begins with *Dun & Bradstreet, Inc. v. Greenmoss Builders* (1985) 472 U.S. 749, 751 (*Dun & Bradstreet*), in which the high court considered the First Amendment interests at stake in a defamation action against a credit reporting agency that circulated a report containing false information about a business's financial position. (*Dun & Bradstreet*, at p. 751 (plur. opn. of Powell, J.).)

---

commercial information by compelling disclosure of data that was relevant to the market participants. (*Id.* at p. 354.) Because "the free speech interests implicated by compelled disclosure of 'purely factual and uncontroversial information' are 'substantially weaker than those at stake when speech is actually suppressed,'" we held that rational basis review was appropriate under California's free speech clause. (*Id.* at p. 356.)

The high court "recognized that not all speech is of equal First Amendment importance" and noted that "[i]t is speech on ' "matters of public concern" ' that is 'at the heart of the First Amendment's protection.' " (*Id.* at pp. 758–759, quoting *First National Bank of Boston v. Bellotti* (1978) 435 U.S. 765, 776.) Evaluating the " 'content, form, and context' " of the credit report " 'as revealed by the whole record' " (*Dun & Bradstreet*, at p. 761), the high court concluded that the report contained speech on matters of purely private concern and therefore warranted reduced constitutional protection (*id.* at pp. 762–763). Specifically, the high court reasoned that the credit report "was speech solely in the individual interest of the speaker and its specific business audience"; that special protection for such credit reporting was not necessary to ensure that " 'debate on public issues [will] be uninhibited, robust, and wide-open' "; and that, like similarly profit-driven commercial speech, credit reporting was "unlikely to be deterred by incidental state regulation." (*Id.* at p. 762.)[14]

Relying on *Dun & Bradstreet*, the D.C. Circuit has declined to apply strict scrutiny to regulations that prohibit the sale of certain consumer information for purposes of targeted marketing. (*Trans Union Corp. v. F.T.C.* (D.C. Cir. 2001) 245 F.3d 809, 818 (*Trans Union I*) [reasoning that marketing lists containing information about individual consumers and their credit performance warrant reduced constitutional protection];

---

[14] Two other Justices joined Justice Powell's plurality opinion. Chief Justice Burger and Justice White concurred in the judgment only, but both agreed with the plurality that the speech at issue did not concern matters of public importance and thus did not warrant special constitutional protection. (See *Dun & Bradstreet, supra,* 472 U.S. at p. 764 (conc. opn. of Burger, C. J.); *id.* at p. 774 (conc. opn. of White, J.).)

*Trans Union LLC v. F.T.C.* (D.C. Cir. 2002) 295 F.3d 42, 52–53 (*Trans Union II*) [same, suggesting that the regulations burdened only commercial speech]; see also *U.S. West, Inc. v. F.C.C.* (10th Cir. 1999) 182 F.3d 1224, 1232–1233 [applying *Central Hudson* intermediate scrutiny to regulation limiting the ability of telecommunications carriers to share customer information]; *National Cable & Telecoms. Ass'n v. F.C.C.* (D.C. Cir. 2009) 555 F.3d 996, 1000–1001 [same, where all parties agreed that the regulated speech was commercial in nature].)

All of these cases suggest that, to the extent a protected speech right is implicated here, intermediate rather than strict scrutiny is the more appropriate standard. Like the regulations at issue in *Trans Union I*, *Trans Union II*, and related cases, section 2076 operates in a commercial setting: It places limits on arrangements for the sharing of information about a class of consumers (here, inmate-consumers of bail services) with commercial actors seeking to profit from that information. Such communications are directly and solely related to the economic interests of the agents: Early access to information identifying potential clients enables the licensee to achieve a competitive advantage over other bail bond agents in soliciting business. And much as in *Beeman*, the communications at issue are "linked inextricably" to commercial bail bond transactions that are subject to extensive governmental regulation, including an extensive governmental licensing regime. (*Beeman, supra,* 58 Cal.4th at p. 352; see *McDonough v. Goodcell, supra,* 13 Cal.2d at p. 743.) Assuming that section 2076 restricts the protected speech rights of bail bond agents, it is not the type of restriction

that warrants the most exacting standard of constitutional review.[15]

Martinez resists this conclusion. She argues that regardless of the economic interests at stake, strict scrutiny is appropriate because section 2076 regulates the content of noncommercial speech concerning a matter of public concern, namely, the identity of persons the state has arrested. There is no question that information about arrests is of great public concern. But to regulate the specific type of notification arrangement at issue — between jail inmates and bail bond agents — is not to prevent the speech of those who want to speak out about arrests or other important criminal justice issues. Martinez contends that section 2076 "criminalizes the free communication about important public facts" by preventing not just bail licensees but also arrestees, those who seek bail services on their behalf, and the public from receiving information about who the state has arrested. This is incorrect: The regulation is directed at the conduct of "bail licensee[s]" (§ 2076); it does not regulate the conduct of any other person. Moreover, section 2076 prohibits only the transmission of arrest information pursuant to a bail licensee's "arrangement" or "understanding" with a jail insider. Nothing in the regulation prohibits bail licensees from obtaining that information through other means available to the general public. Indeed, the

---

[15] This conclusion is consistent with *Sorrell*, *supra*, 564 U.S. 552, in which the high court employed what it described as "a special commercial speech inquiry" to evaluate the constitutionality of a state law that restricted the sale, disclosure, and use, for marketing purposes, of pharmacy records that revealed the prescribing practices of individual doctors. (*Id.* at p. 571; see *id.* at pp. 571–572, citing, inter alia, *Central Hudson, supra*, 447 U.S. 557.)

California Public Records Act requires state and local law enforcement to publicly disclose information about recent arrests upon request (Gov. Code, § 6254, subd. (f)(1); *County of Los Angeles v. Superior Court* (1993) 18 Cal.App.4th 588, 595), and section 2076 explicitly permits the bail licensees to request the public records of specific inmates. In short, section 2076 is much more limited than Martinez suggests: It focuses on the transmission of information about arrestees to commercial actors, for a commercial purpose, pursuant to an "arrangement" or "understanding," and not on the dissemination of arrestee information more generally.

For these reasons, we reject Martinez's arguments for strict scrutiny. As previously noted, however, we need not definitively decide whether intermediate scrutiny or a lesser standard should apply. We assume without deciding that intermediate scrutiny applies and, for the reasons below, hold that, considered on its face, section 2076 survives that heightened standard.

## III.

The intermediate scrutiny inquiry under *Central Hudson* consists of a multipart test for evaluating whether a restriction on commercial speech unconstitutionally infringes freedom of speech. At the threshold, we must determine whether the speech concerns lawful activity and is not misleading. (*Central Hudson*, *supra*, 447 U.S. at p. 566.) Assuming that threshold is met, the state must show that the regulation is supported by a "substantial" governmental interest; that the regulation "directly advances the governmental interest asserted"; and that the regulation "is not more extensive than is necessary to serve that interest." (*Ibid.*)

As a threshold matter, there is no dispute that section 2076 regulates the transmission of expression that neither relates to unlawful activity nor is misleading. Section 2076 prohibits arrangements to share information about recent arrests, even when that information is accurate, and regardless of whether the arrangement is meant to facilitate unlawful conduct (for example, direct solicitation of inmates in violation of Cal. Code Regs., tit. 10, § 2079.1). Accordingly, the state bears the burden to demonstrate that the regulation is narrowly tailored to advance a substantial governmental interest.

There is also no dispute that the government's asserted interests in the regulation are substantial. We agree. First, the Attorney General contends that section 2076 advances the state's interest in promoting "sound, secure jail administration." We have little trouble concluding that this interest is substantial for purposes of *Central Hudson*; our cases have emphasized the importance of the state's interests in " 'preserv[ing] internal order and discipline' " and " 'maintain[ing] institutional security' " in the jail and prison environment. (*In re Jenkins* (2010) 50 Cal.4th 1167, 1175, quoting *Bell v. Wolfish* (1979) 441 U.S. 520, 547; see also *People v. Dolezal* (2013) 221 Cal.App.4th 167, 174 ["orderly and efficient jail administration" is a substantial state interest].) Second, the Attorney General argues that section 2076 furthers the state's interest in promoting "fair competition in the bail bond industry." We conclude that this interest is also substantial. Long ago, we recognized that the "bail bond business is such a business as is subject to reasonable regulation under the police power of the state" and noted the Legislature's determination that "abuses" in the industry required "that there be some public supervision" of the field. (*McDonough v.*

*Goodcell*, *supra*, 13 Cal.2d at p. 746.) And in cases concerning other professionals, like lawyers and accountants, the high court has recognized that the state has compelling and important interests in licensing and regulating the practice of the professions and in maintaining standards of ethical conduct in those fields. (*Florida Bar v. Went For It, Inc.*, *supra*, 515 U.S. at p. 625; *Edenfield v. Fane* (1993) 507 U.S. 761, 770.) Bail bond agents are licensed professionals who are "an integral part of the criminal justice system," and we conclude that the state has a similarly substantial interest in establishing rules for fair competition in the industry and ensuring that bail bond agents operate in an "honest and professional manner." (*Dolezal*, at p. 174.)

Martinez's main contention is that section 2076 does not directly advance the interests asserted by the state. The Court of Appeal agreed with her on this point. Although the court briefly acknowledged the state's argument that section 2076 promotes fair competition and sound jail administration (*Martinez*, *supra*, 59 Cal.App.5th at pp. 307–308), the court focused its analysis on a narrower state interest — "preventing unlawful, predatory solicitation of arrestees" (*id.* at p. 311). The court "assume[d] that section 2076 might indirectly deter unlawful solicitation of arrestees," but reasoned that "an indirect effect is not enough to survive judicial scrutiny." (*Id.* at p. 313.) Because, in the court's view, the state had not demonstrated that section 2076 "*directly and materially* advance[d] the state's substantial interests," the court concluded that the state had "failed to carry its burden." (*Martinez*, at pp. 312, 313.)

By focusing narrowly on whether section 2076 would prevent bail bond agents from engaging in unlawful solicitation,

the Court of Appeal failed to account for the full range of governmental interests at stake. California Code of Regulations, title 10, section 2076 is not merely an ancillary regulation designed to bolster the prohibitions on predatory solicitation practices found in California Code of Regulations, title 10, section 2079.1 (prohibiting direct solicitation of arrestees) and Penal Code section 160 (prohibiting the employment of unlicensed jail inmates to conduct direct solicitation). Section 2076's prohibition on notification arrangements with current inmates aims primarily at other purposes: It is designed to serve the state's interest in sound, secure jail administration and to prevent the sort of corruption and unfair competition in the bail bond industry more generally that prompted the creation of the current system of bail bond regulation. (See *Martinez*, *supra*, 59 Cal.App.5th at p. 315 (dis. opn. of Grover, J.).)

Under United States Supreme Court precedent, we may consult "history" and even " 'simple common sense' " to determine whether a speech regulation advances substantial government interests under *Central Hudson*. (*Florida Bar v. Went For It, Inc.*, *supra*, 515 U.S. at p. 628.) The historical record, recent experience, and common sense all confirm that section 2076 directly and materially advances the interests the state has identified here. By prohibiting arrangements with inmates that "facilitate the wholesale identification of people with imminent bail needs" (*Martinez*, *supra*, 59 Cal.App.5th at p. 315 (dis. opn. of Grover, J.)), section 2076 prevents bail bond businesses from developing insider information networks within jails and prisons that would give them an unfair "first mover" advantage in the bond services market. As Martinez acknowledges, bail bond businesses would benefit from this first

mover advantage even if they engaged in strictly lawful solicitation — for example, of an arrestee's family members (see Cal. Code Regs., tit. 10, §§ 2079, 2079.1), who are likely to be in a particularly vulnerable position and liable to engage the services of the first bail bond agent to reach out directly. With section 2076 in place, bail bond businesses cannot compete based on the speed with which they can procure inside information about arrestees and reach those vulnerable consumers; instead, they must seek the arrest information from publicly available arrest reports or wait to receive a bona fide request for bail services from the arrestees, their families, or their designated representatives. (See Cal. Code Regs., tit. 10, § 2079.1.) As the Attorney General explains, section 2076 thereby encourages more "legitimate forms of competition," such as competition on "price, scope, and quality of services."

The history behind the Bail Bond Regulatory Act shows how these types of insider arrangements enabled certain firms to gain monopolistic control over bail in the regions where they operated.[16] Before the Act's passage, public attention focused,

---

[16] In recounting the history behind the Act and describing more recent examples of the prohibited notification arrangements, the Attorney General's briefs rely on materials such as newspaper and journal articles and government reports that are not formally part of the evidentiary record. Martinez has not objected to our consideration of those materials, and at oral argument, Martinez's counsel expressly agreed that we can consider the materials as an aid to our interpretation of the law. (See, e.g., *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 776, fn. 5 ["In determining de novo what the law is, appellate courts routinely consider materials that were not introduced at the trial, including publications containing expressions of viewpoints and generalized statements about the state of the world. These are considered

in particular, on abuses by one of the first for-profit bail bond businesses in the United States, the McDonough Brothers Bail Bond Brokers.  (Barnes, *"Fountainhead of Corruption": Peter P. McDonough, Boss of San Francisco's Underworld* (1979) 58 Cal. History 142, 151–152.)  The public learned that the McDonough Brothers had "monopolized the bail bond business in San Francisco" by developing a system for acquiring insider information about the bail needs of recent arrestees.  (Barnes, at p. 145.)  "Besides stationing functionaries of the firm at local, state, and federal courts, the McDonough organization created a remarkable network of informants" — including police officers who "provided daily lists of who had been arrested, the charges, and the bail set" — and even set up radios that connected the prisons and jails to the McDonough offices.  (*Id.* at p. 146.)  The firm reportedly used the information it acquired to quickly solicit business from recent arrestees and secure release orders from the city's superior court judges.  (*Ibid.*)  A 1937 report following an investigation into citywide corruption — the "Atherton Report" — found that the McDonough Brothers had developed a "virtual 'corner' on the [b]ail bonds business" by " 'freez[ing] out' " its competition and noted that the firm had used the wealth, influence, and police connections that it had acquired through that business to expand into the city's other vice trades, like prostitution, gambling, and bootlegging. (*Report to the 1937 Grand Jury on Graft in the San Francisco*

---

not as a substitute for evidence but as an aid to the court's work of interpreting, explaining and forming the law."]; *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 482–483, 485–487 [relying on newspaper articles describing, among other things, the details of mass shootings and legislative negotiations in evaluating the state interests involved in a constitutional challenge to California's assault weapons ban].)

*Police Department*, reprinted in S.F. Chronicle (Mar. 17, 1937) p. F2, col. 4; see also Barnes, at pp. 146–147.)  According to news reports of the time, bail bond businesses across the state engaged in similar abusive practices, recruiting police officers to notify them of recent arrests in exchange for a share of the bail premium and using that information to charge exorbitant bond fees from friends or relatives of the arrestees.  (See, e.g., *Bail Bondsmen Facing Inquiry*, L.A. Times (June 25, 1941) p. 23.)[17] These abusive practices, among others, led to the passage of the Bail Bond Regulatory Act and, later, to the Insurance Commissioner's promulgation of regulations like section 2076 that are still in force today.  (See, e.g., *Bills to End M'Donough's Rule Signed*, S.F. Examiner (July 3, 1937) p. 1; MacDonald, *48 Stringent Rules Set Up By Caminetti*, S.F. Chronicle (Dec. 8, 1941) p. 29.)

Recent reports indicate that these practices continue to undermine fair competition in the industry, with deleterious effects on the internal jail and prison environment.  For example, the Court of Appeal took judicial notice of the Insurance Commissioner's 2018 report titled Recommendations for California's Bail System, which emphasized the need to improve oversight and regulation of the bail industry to protect vulnerable bail consumers.  (See *Martinez, supra*, 59 Cal. App.5th at p. 311, fn. 13.)  The report noted that recent investigations had uncovered "schemes by bail agents to scoop business away from competitors by rewarding jail inmates with money added to their jail accounts for providing information about newly booked individuals in the jails."  (Cal. Dept. of

_____

[17]    See also *Bail Bondsmen Activities Probed*, San Pedro News-Pilot (June 24, 1941) p. 2; *Bail Broker Control Bill in Assembly*, Oakland Tribune, *supra*, at p. 5.

Insurance, Recommendations for California's Bail System, *supra*, at p. 6.)  Those investigations found that the schemes undermined the security conditions within the jail because the inmates recruited to provide such information would frequently threaten or pressure other inmates to engage the services of certain bail bond firms and would retaliate against those working for rival businesses.  (See Lewis, *Inside Santa Clara Jails, Predatory Bail Schemes Flourished for Years*, *supra*, KQED.)  Other states have grappled with similar problems arising from similar notification arrangements.  (See, e.g., State of N.J., Com. of Investigation, Inside Out:  Questionable and Abusive Practices in New Jersey's Bail-Bond Industry, *supra*, at pp. 12–13.)  By prohibiting such schemes, section 2076 directly serves the state's substantial interests in avoiding such adverse consequences.

Finally, we must consider whether section 2076 is "more extensive than is necessary to serve" those substantial governmental interests.  (*Central Hudson*, *supra*, 447 U.S. at p. 566.)  This step of the analysis requires that there be a " ' "fit" between the legislature's ends and the means chosen to accomplish those ends,' [citation] — a fit that is not necessarily perfect, but reasonable."  (*Board of Trustees, State Univ. of N.Y. v. Fox*, *supra*, 492 U.S. at p. 480.)  Unlike strict scrutiny, intermediate scrutiny does not require the Legislature to choose the "least restrictive means," so long as the means are "narrowly tailored to achieve the desired objective."  (*Ibid.*; *Florida Bar v. Went For It, Inc.*, *supra*, 515 U.S. at p. 632.)

As applied to arrangements with jail inmates, section 2076 is narrowly tailored because it prohibits only the very "arrangement[s]" or "understanding[s]" that have led to the unfair competitive practices and jail administration issues

identified by the Attorney General. As we have already explained (see pp. 10–11, *ante*), Martinez overstates the scope of section 2076 when she contends that the regulation prohibits bail licensees from receiving information about recent arrests. Instead, while the regulation does forbid both formal and less formal arrangements between licensed bail bond agents and inmates about the sharing of arrest information, bail licensees are free to obtain that information through public records requests or any other publicly available source.

Moreover, Martinez is incorrect when she argues that other provisions — like California Code of Regulations, title 10, section 2079.1, which prohibits bail licensees from directly soliciting arrestees who have not requested their services, and Penal Code section 160, which prohibits bail licensees from employing inmates to solicit arrestees on the licensees' behalf — suffice to address the governmental interests at stake. In making this argument, Martinez repeats the error of the Court of Appeal, which failed to appreciate that California Code of Regulations, title 10, section 2076 addresses distinct harms to fair competition and secure jail administration that can arise from even lawful solicitation practices that capitalize on asymmetric access to information about new arrestees.

In sum, our opinion today assumes without deciding that section 2076 burdens a protected speech right. To the extent it does, we hold that intermediate, rather than strict, scrutiny applies, and that section 2076 passes muster. The Court of Appeal erred in concluding that the People had failed to make a sufficient showing that section 2076 directly advances the state's interests. The court's analysis focused narrowly on the question whether the regulation would deter the unlawful solicitation of arrestees. Its attention thus diverted, the court

failed to consider other substantial interests at stake — interests that the regulation is, in fact, narrowly drawn to advance. Martinez's facial challenge to the regulation therefore fails.

We emphasize that our conclusion is limited to the facial validity of the regulation. A litigant mounting a facial challenge bears a formidable burden to demonstrate the regulation's invalidity in "at least ' "the generality" ' [citation] or 'vast majority' " of cases. (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education*, *supra*, 57 Cal.4th at p. 218.) This is an "exacting" standard (*ibid.*) — understandably so, because the consequence of facial invalidation is to undo the work of the political branches of government, without regard to the circumstances of the case at hand (*Washington State Grange v. Washington State Republican Party* (2008) 552 U.S. 442, 450–451). Our decision, however, does not foreclose future as-applied challenges to section 2076 — either to applications of the law to inmate arrangements that might, under the circumstances of a particular case, raise distinct constitutional concerns, or to arrangements with other groups of informants. Although Martinez has not prevailed in her argument for invalidating section 2076 on its face, our holding today leaves open the possibility that other litigants may raise more particularized challenges.

## IV.

We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

**KRUGER, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Martinez

_____

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 59 Cal.App.5th 280
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S267138
**Date Filed:** August 24, 2023

_____

**Court:**  Superior
**County:**  Santa Clara
**Judge:**  Socrates Peter Manoukian

_____

**Counsel:**

Law Office of John Rorabaugh, John Mark Rorabaugh; and Lori A. Quick, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Michael J. Mongan, State Solicitor General, Lance E. Winters, Chief Assistant Attorney General, Janill L. Richards, Principal Deputy State Solicitor General, Jeffrey M. Laurence, Assistant Attorney General, Samuel T. Harbourt, Deputy State Solicitor General, René A. Chacón and Julia Y. Je, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

John Mark Rorabaugh
Law Office of John Rorabaugh
801 Parkcenter Drive, Suite 205
Santa Ana, CA 92705
(714) 617-9600

Samuel T. Harbourt
Deputy State Solicitor General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3919