[No. S175242. Oct. 28, 2010.]

In re HARVEY ZANE JENKINS on Habeas Corpus.

1168

## COUNSEL

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Jessica N. Blonien, Anya M. Binsacca, Jennifer A. Neill and Christopher J. Rench, Deputy Attorneys General, for Appellant State of California.

Linnéa M. Johnson, under appointment by the Supreme Court, and S. Lynne Klein, under appointment by the Court of Appeal, for Respondent Harvey Zane Jenkins.

## OPINION

CHIN, J.—A prison inmate's participation in a prison work program may favorably affect that inmate's custody level. Such participation can cause the inmate to be considered a reduced security risk, which in turn may cause the inmate to be placed in a lower security level institution. We must decide whether an inmate who is willing to work but, without his or her fault, is not assigned to a work program may receive the benefit of work participation for classification purposes. The applicable regulations say no; they provide that actual work participation, and not mere willingness to work, is required for an inmate to receive a lower security evaluation. Petitioner contends the regulations are invalid. In accordance with the deference courts generally give to prison authorities in promulgating regulations concerning prison security, we conclude the regulations are valid. It is rational, and not arbitrary, to consider an inmate's actual work performance for purposes of classifying and housing that inmate.

## I. FACTS AND PROCEDURAL HISTORY

We take these facts, which are undisputed, largely from Justice Robie's opinion in the Court of Appeal.

Petitioner Harvey Zane Jenkins is in the custody of California's Department of Corrections and Rehabilitation. He was convicted in 1993 of second degree murder with personal use of a firearm and sentenced to state prison for 15 years to life plus three years. (Pen. Code, §§ 187, 190, subd. (a), 12022.5, subd. (a).) The record indicates that he became eligible for parole on April 29, 2005.

On December 21, 2005, petitioner was transferred from Centinela State Prison to High Desert State Prison. He was not assigned to a work program at High Desert until January 12, 2006. From January 12 to March 9, 2006, he was assigned as "Facility C housing porter." On March 9, he was transferred to another facility within High Desert, where he spent 172 days without a work assignment. He was subsequently assigned to an educational program.

California prison inmates are classified pursuant to a scoring system that determines their prison custody level. (See pt. II., *post*.) A higher score means the inmate is considered a higher security risk and would be assigned to a correspondingly higher security facility; a lower score means the inmate is considered a lower security risk and would be assigned to a correspondingly lower security facility. After the initial classification, inmates receive an annual classification review. Among the factors considered in this annual review is the inmate's participation in a work, school, or vocational program.

On October 24, 2006, prison authorities conducted the annual review of petitioner's classification score, covering the period from October 1, 2005, through September 30, 2006. Petitioner received a four-point reduction in his score for having no serious disciplinary actions and a two-point reduction (out of a possible maximum of four points) for average or above average performance in a work, school, or vocational program. As was later explained, he was denied the additional two performance points that were available because he "was unassigned to a program for roughly half of the total review period."

Petitioner pursued an internal administrative appeal. He contended that because his transfer to High Desert was not adverse, he was entitled to the full four-point reduction for average or above average performance in a work, school, or vocational program. His appeal was denied at all administrative levels. On July 25, 2007, he filed the instant petition for writ of habeas corpus in the Lassen County Superior Court. Following *In re Player* (2007)

146 Cal.App.4th 813 [53 Cal.Rptr.3d 233] (*Player*), the superior court determined that because petitioner's work-qualifying status was disrupted based on circumstances and department conduct beyond his control, he was entitled to additional favorable work points. In an order signed and filed April 25, 2008, the court granted petitioner's petition and directed the department "to reduce [his] classification score by two points and to thereupon make whatever adjustments to [his] custody designation, program and institution placement as may appear."

The superior court served its order on the parties by mail on April 29, 2008. On June 27, 2008, the warden of High Desert, represented by the Attorney General, filed a notice of appeal. Originally, the Court of Appeal dismissed the appeal as untimely because it was not filed within 60 days of the time the superior court signed and filed the order being appealed. (Citing Cal. Rules of Court, rules 8.308(a), 8.388.) Later, the Court of Appeal granted the Attorney General's petition for rehearing, reinstated the appeal, and directed the parties to address in their briefs the issue of whether the appeal was timely. In their briefs in the Court of Appeal, the Attorney General argued, and petitioner conceded, that the appeal was timely because the notice of appeal was filed within 60 days of the date the court served its order on the parties by mail.

The Court of Appeal agreed that the appeal was timely. It summarized its reasoning: "[U]nder [California Rules of Court,] rule 8.308(a), 'a notice of appeal . . . must be filed within 60 days after the rendition of the judgment or the making of the order being appealed.' Where, as here, the order being appealed was not pronounced in open court, but instead was embodied solely in a writing that was prepared, signed, and filed outside the presence of the parties, we conclude 'the making of the order' does not occur until the court undertakes to communicate the substance of its order to the parties in some reasonable manner. That occurred here when the court mailed copies of the written order to the parties four days after the order was signed and filed. Because the warden filed his notice of appeal within 60 days of the date of that mailing, the appeal is timely."

On the merits, the Court of Appeal reversed the superior court's grant of the habeas corpus petition. It summarized its reasoning in this regard also: "[W]e conclude the superior court erred in determining Jenkins was entitled to the additional two work/school performance points for the time he did not actually participate in any work, school, or vocational program. A governing department regulation specifies that '[f]avorable points shall not be granted for average or above average performance for inmates who are not assigned to a program.' (Cal. Code Regs., tit. 15, § 3375.4, subd. (a)(3)(B).) Because the department's interpretation and application of that regulation here to deny

Jenkins the additional work/school performance points he sought was not arbitrary, capricious, or irrational, the department's decision must be upheld."

We granted petitioner's petition for review, which presented the following issue: "Is the Department of Corrections and Rehabilitation's denial of favorable classification points for work or school to a prisoner whose classification point-qualifying assignment was disrupted for a period due to a nonadverse transfer to another facility, arbitrary, capricious, and/or irrational in light of the award of work-time credits which reduced the prisoner's sentence for the same period of incarceration?"

## II. Discussion

■ The Legislature has directed the Secretary of the Department of Corrections and Rehabilitation to "cause each person who is newly committed to a state prison to be examined and studied." (Pen. Code, § 5068.)[1] "Upon the basis of the examination and study, the [secretary] shall classify prisoners . . . ." (Pen. Code, § 5068.) The Legislature has provided no specific guidance regarding how prisoners should be classified but instead has authorized the secretary to "prescribe and amend rules and regulations for the administration of the prisons . . . ." (Pen. Code, § 5058.) By enacting these statutes, "[t]he Legislature has given the [secretary] broad authority for the discipline and classification of persons confined in state prisons. [Citations.] This authority includes the mandate to promulgate regulations governing administration, classification and discipline." (*In re Lusero* (1992) 4 Cal.App.4th 572, 575 [5 Cal.Rptr.2d 729].)

■ This case involves prisoner classification. "To ensure uniform application of the classification process, the [secretary], pursuant to the authority vested in him under Penal Code section 5058, has promulgated regulations stating the factors to be considered by the correctional officer responsible for determining an inmate's security classification." (*In re Richards* (1993) 16 Cal.App.4th 93, 97 [19 Cal.Rptr.2d 797], fn. omitted; see Cal. Code Regs., tit. 15, § 3375 et seq.)[2] These regulations provide that "[t]he classification of felon inmates shall include the classification score system as established. A lower placement score indicates lesser security control needs and a higher

---

[1] Formerly, the administrative head of the department (then the Department of Corrections) was called the Director of Corrections. In 2005, the Legislature abolished the office of the Director of Corrections and replaced it with the secretary. (Pen. Code, §§ 5050, 5054.) Some Penal Code provisions still use the term "Director of Corrections," but any such reference now "refers to the Secretary of the Department of Corrections and Rehabilitation." (Pen. Code, § 5050.) Accordingly, we will change all references to the "director" to refer to the secretary.

[2] All further undesignated section references are to title 15 of the California Code of Regulations.

placement score indicates greater security control needs." (§ 3375, subd. (d).) "Prisoner classification scores play a significant role in determining where, within the state's many prison facilities, a prisoner will be sent to serve his/her term of incarceration. (See Cal. Code Regs., tit. 15, § 3375.1.) As a general rule, a prisoner's classification score is directly proportional to the level of security needed to house the inmate. For example, prisoners with high classification scores will be sent to the prisons with higher levels of security. (See Cal. Code Regs., tit. 15, §§ 3375.1 & 3377.)" (*In re Richards, supra,* at p. 95, fn. 1.)

After the initial classification under Penal Code section 5068, each inmate's classification score is reviewed at least annually. (§ 3376, subd. (d)(2)(A).) The Court of Appeal explained the regulatory scheme relevant here: " 'For an annual reclassification review, two six-month periods may be counted. When an inmate's status is interrupted during the period without inmate fault, the period shall be considered continuous.' ([§ 3375.4, subd. (a).]) Under California Code of Regulations, title 15, section 3375.4, subdivision (a)(2), an inmate is entitled to two favorable points (that is, points that are subtracted from the classification score) '[f]or each six-month period since the last review with no serious disciplinary(s).' Under California Code of Regulations, title 15, section 3375.4, subdivision (a)(3), an inmate is also entitled to two favorable points '[f]or each six-month period with an average or above performance in [a] work, school or vocational program.' " This latter provision is qualified by section 3375.4, subdivision (a)(3)(B)—the regulation primarily at issue here—which provides: "Favorable points shall not be granted for average or above average performance for inmates who are not assigned to a program."

Petitioner received two favorable points for performance in a work, school or vocational program (hereafter, work program or program), but he did not receive the maximum of four points available because he was unassigned to a program for about half the relevant time period. In his briefs, he argues that because he was *willing* to work, and unassigned through no fault of his own, he was entitled to the maximum point reduction available.[3] The parties agree that he was unassigned through no fault of his own. Thus, the issue is squarely presented: Must the inmate actually *participate* in a work program to receive classification credit for such participation? Or, conversely, is it sufficient if the inmate is willing to work and is unassigned through no fault of the inmate? Section 3375.4, subdivision (a)(3)(B), quoted in the previous paragraph, unambiguously answers the former question in the affirmative and the latter in the negative. Petitioner contends, however, that the regulation is invalid on various grounds.

---

[3] At oral argument, petitioner made various additional arguments that are not within the scope of review. We do not consider those arguments. (Cal. Rules of Court, rule 8.516(b).)

He argues the regulation violates his right to due process of law under both the United States and the California Constitutions. We disagree. Courts necessarily review decisions and regulations regarding prison classification deferentially. Classification of inmates, which determines the level of security necessary for each inmate, obviously implicates institutional security. "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." (*Pell v. Procunier* (1974) 417 U.S. 817, 823 [41 L.Ed.2d 495, 94 S.Ct. 2800].) The high court has explained that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. [Citations.] 'Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.' [Citation.] We further observe that, on occasion, prison administrators may be 'experts' only by Act of Congress or of a state legislature. But judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." (*Bell v. Wolfish* (1979) 441 U.S. 520, 547–548 [60 L.Ed.2d 447, 99 S.Ct. 1861], fns. omitted.)

In a later decision, the high court returned to this theme: "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint." (*Turner v. Safley* (1987) 482 U.S. 78, 84–85 [96 L.Ed.2d 64, 107 S.Ct. 2254]; see also *Overton v. Bazzetta* (2003) 539 U.S. 126, 132 [156 L.Ed.2d 162, 123 S.Ct. 2162] ["We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."].)

Often citing the high court decisions, California cases have also stressed the need for courts to defer to prison authorities in running the prison system. (*Woods v. Horton* (2008) 167 Cal.App.4th 658, 673 [84 Cal.Rptr.3d 332]; *In re Zepeda* (2006) 141 Cal.App.4th 1493, 1498 [47 Cal.Rptr.3d 172]; *In re Farley* (2003) 109 Cal.App.4th 1356, 1361–1362 [1 Cal.Rptr.3d 108]; *Small v. Superior Court* (2000) 79 Cal.App.4th 1000, 1013–1014 [94 Cal.Rptr.2d

550]; *In re Lusero, supra*, 4 Cal.App.4th at p. 575; *In re Wilson* (1988) 202 Cal.App.3d 661, 666–667 [249 Cal.Rptr. 36].) "This deference, which extends to classification decisions [citation], limits judicial intervention to demonstrated instances of actions by prison officials that are arbitrary, capricious, irrational, or an abuse of the discretion granted those given the responsibility for operating prisons." (*In re Wilson, supra*, at p. 667; see also *In re Farley, supra*, at p. 1361.)

■ Petitioner cites another test that has been applied in this context but that appears to have little relevance here. The United States Supreme Court has held that the denial of good time credits which can reduce the period of incarceration "does not comport with 'the minimum requirements of procedural due process,' [citation], unless the findings of the prison disciplinary board are supported by *some evidence* in the record." (*Superintendent v. Hill* (1985) 472 U.S. 445, 454 [86 L.Ed.2d 356, 105 S.Ct. 2768], italics added.) Although the high court has also held that prison inmates have no federal due process right to any particular prison classification (*Moody v. Daggett* (1976) 429 U.S. 78, 88, fn. 9 [50 L.Ed.2d 236, 97 S.Ct. 274]; *Meachum v. Fano* (1976) 427 U.S. 215, 224–225 [49 L.Ed.2d 451, 96 S.Ct. 2532]), California courts have applied the "some evidence" test to adverse classification actions. (*In re Farley, supra*, 109 Cal.App.4th at p. 1362; *In re Wilson, supra*, 202 Cal.App.3d at pp. 666–667.)[4] Here, however, the relevant facts are undisputed. Section 3375.4, subdivision (a)(3)(B), provides that inmates who are not assigned to a program shall be not granted favorable performance points. Petitioner does not deny that he was unassigned for approximately half of the review period. The only dispute is the legal significance of this fact. Accordingly, if section 3375.4, subdivision (a)(3)(B), is valid—a legal issue that *is* disputed—then clearly some evidence supports the finding that petitioner is not entitled to the favorable score at issue here.

■ Accordingly, in determining whether section 3375.4, subdivision (a)(3)(B), comports with due process requirements under either the United States or California Constitution we ask whether it is arbitrary, capricious, or irrational. Applying this test, we conclude the regulation is valid. In assessing the level of security an inmate needs, it is rational for the department to consider as one factor participation in a work program.

---

[4] Petitioner argues that the "some evidence" test applies to the superior court's ruling granting the petition for writ of habeas corpus rather than the department's action. On the contrary, the test applies to the department's actions, not the superior court's. As the *Farley* court explained, "A court must uphold the classification action if *it* is supported by ' "some" ' evidence." (*In re Farley, supra*, 109 Cal.App.4th at p. 1362, italics added.) The italicized word "it" clearly refers to the classification action, not a later court action either upholding or setting aside the classification action. (See also *Superintendent v. Hill, supra*, 472 U.S. at p. 454; *In re Zepeda, supra*, 141 Cal.App.4th at p. 1498.) Courts give the deference to prison authorities, not to reviewing courts or trial courts.

Petitioner does not seem to argue otherwise. But petitioner contends that prison authorities may not distinguish between (1) inmates who are *willing* to work but are unassigned through no fault of their own and (2) inmates who *actually* work. We agree with the Court of Appeal in rejecting this argument: "The department could have rationally determined that an inmate who performs at average or above average level in a work, school, or vocational program requires less security than an inmate who performs below average or who has not demonstrated any performance in such a program. Thus, there is a rational basis for the department's regulation that denies work/school performance points to inmates who are not assigned to a program, regardless of whether the lack of an assignment is attributable to the inmate or to the department." It is rational to require the inmate to be assigned to a work program and to perform satisfactorily in that program. Otherwise, prison officials could not meaningfully assess that inmate's security risk for purposes of classifying and housing the inmate in the system.

In his petition for writ of habeas corpus and its order granting relief, petitioner and the superior court relied on *Player, supra,* 146 Cal.App.4th 813. *Player*'s facts were complex, but the *Player* court ultimately held that the inmate in that case was entitled to classification points for work participation during a time period in which he was not assigned to a program. As relevant to the issue on review, the Court of Appeal in *Player* analogized classification decisions to statutory and regulatory provisions concerning work credits that inmates may receive towards their release date from prison. To understand this portion of *Player*, we must briefly discuss prison release work credits.

"Penal Code section 2933 offers state prisoners who participate in qualifying work, training and educational programs the privilege of earning 'worktime credit' (*id.,* subd. (a)) against their sentences." (*In re Reeves* (2005) 35 Cal.4th 765, 768 [28 Cal.Rptr.3d 4, 110 P.3d 1218], fn. omitted.)[5] In some circumstances, inmates may receive such worktime credit even for time when they do not actually work. (See *In re Carter* (1988) 199 Cal.App.3d 271 [244 Cal.Rptr. 648]; *In re Reina* (1985) 171 Cal.App.3d 638 [217 Cal.Rptr. 535].) The prison regulations reflect this circumstance. They provide that qualifying inmates may, under certain circumstances, receive worktime credits, called " 'S' time," for time periods in which they are not actually working. (§ 3045.3.)

The *Player* court considered "S" time and classification decisions to be linked and concluded that if an inmate receives "S" time credit for a certain

---

[5] Penal Code section 2933 has been amended occasionally over the years, and the precise rules regarding who may receive credit, and how much, have varied. Because this case involves classification rather than worktime credit, we need not go into this matter further.

time period, that inmate is also entitled to favorable classification points for working during that time period even if the inmate did not actually work. (*Player, supra*, 146 Cal.App.4th at pp. 827–829.) The superior court relied on this conclusion in finding that petitioner was entitled to "S" time credit and, accordingly, also favorable classification credit.

The problem with this rationale is that worktime credit and classification decisions, although somewhat analogous, are *not* linked, at least not by statute or regulation. Worktime credits are governed by Penal Code section 2933, which limits the discretion of prison authorities. Classification is governed by Penal Code section 5068, which leaves much to the discretion of prison authorities. Similarly, the regulations governing classification are distinct from those governing worktime credits, including "S" time. Although the regulations governing worktime credits do· grant such credits for some time periods in which an inmate is not working, the regulations governing classification scores specifically provide that "[f]avorable points shall not be granted for average or above average performance for inmates who are not assigned to a program." (§ 3375.4, subd. (a)(3)(B).) Accordingly, as the Court of Appeal here observed in disagreeing with *Player*, "in contrast to worktime credits, work/school performance points *do* depend on actual *assignment* to a qualifying program and *do* reward actual *performance* in such a program, namely, performance that is average or better."

The *Player* court quoted section 3375.4, subdivision (a)(3)(B), but it never directly confronted it. It did not explain whether it found that the section is (1) ambiguous or inapplicable and, if so, why; or (2) invalid and, if so, why. Instead, it simply said that "[e]ven though 'S' time *technically* refers to excused work time for purposes of calculating credit off of a prisoner's sentence, we do not believe it is logical or fair to deny Player the favorable behavior points for each respective six-month period at issue in this case under this somewhat analogous situation where his credit-qualifying assignments were disrupted or changed due [to reasons not his fault]. To find otherwise would deprive Player of the favorable points he would have earned during those 'continuous' periods if he had been left in the assignment status he was in before it was changed to unassigned by the actions of the [department]." (*Player, supra*, 146 Cal.App.4th at p. 828, fn. omitted, italics added.) But the fact that worktime credits and classification decisions are governed by entirely distinct statutes and regulations is not a mere technicality. Section 3375.4, subdivision (a)(3)(B), is unambiguous and, as we have explained, it does not violate due process. It controls this case.

Petitioner argues that it is unfair to deny him the benefits of participation in a work program when he was willing to work and was unassigned through no fault of his own. But, as we have explained, it is neither arbitrary nor

irrational to consider actual work performance in determining how much of a security risk the inmate presents. Accordingly, we must defer to the judgment of prison officials in providing for institutional security.

Petitioner also contends that, because worktime credits—which can accelerate an inmate's release into society—are sometimes given for mere willingness to work, logic demands the same rules should apply to classification decisions. He argues that "it simply cannot be the case that the governmental interest in public safety implicated by the release of an inmate into society at large early because he was willing to work, but was absent from work with authorization, or was willing to work and was simply not assigned to a program, is less compelling than [the department's] interest in maintaining prison security at a level that would be compromised by awarding an inmate two classification points in a six-month period, and which will only change his security classification within the institution in limited circumstances." But these are *policy* decisions that are neither arbitrary nor capricious. The Legislature and, acting under legislative constraint, prison authorities made one policy decision regarding worktime credits. Prison authorities, exercising the discretion the Legislature has given them, made a different policy decision concerning prison classification. As the Court of Appeal stated in this case, "just because the Legislature decided an inmate should get time off his sentence for being willing to participate in a work or school program does not mean the department was bound to decide that the same inmate poses a lesser security risk while in prison because of that same willingness."

Ensuring institutional security and determining when an inmate must be released into society are not the same thing and need not be governed by the same policy decisions. Under the determinate sentence law, when an inmate who has been sentenced to a determinate term has served that term, even as reduced by credits, that inmate must be released even if possibly still dangerous. "Prisoners sentenced to determinate terms had a date certain upon which they would be released . . . ." (*In re Monigold* (1983) 139 Cal.App.3d 485, 491 [188 Cal.Rptr. 698]; see § 3075.2, subd. (a).) Even inmates in a maximum security prison can receive worktime credits and must be released when they have served their sentence. Moreover, for convicted murderers like petitioner, who are sentenced to an indeterminate term, the connection between worktime credits and actual release is greatly attenuated. Inmates sentenced to an indeterminate term generally do not receive Penal Code section 2933 credits (*In re Monigold* (1988) 205 Cal.App.3d 1224, 1227 [253 Cal.Rptr. 120]), and to the extent those inmates do receive credits towards their sentence, the credits go towards advancing only their minimum eligible release date, not their actual release from prison. (*In re Dayan* (1991) 231 Cal.App.3d 184 [282 Cal.Rptr. 269].) Petitioner's minimum eligible parole

release date has already passed. Deciding when to actually release an inmate serving an indeterminate term is governed by different rules and regulations. (See generally *In re Rosenkrantz* (2002) 29 Cal.4th 616, 653–654 [128 Cal.Rptr.2d 104, 59 P.3d 174].) Thus, neither logic, regulation, statute, nor constitutional mandate requires that the rules governing worktime credits also govern classification decisions.

Petitioner also argues that the Court of Appeal erred in considering the Attorney General's argument defending section 3375.4, subdivision (a)(3)(B)'s validity—that it is rational to consider actual work performance as a classification factor—because the Attorney General did not make that argument in the superior court. In his original petition for writ of habeas corpus in the superior court, petitioner relied exclusively on *Player, supra,* 146 Cal.App.4th 813. In his return, the Attorney General relied in part on section 3375.4, subdivision (a)(3)(B), but did not specifically discuss the section's constitutional validity. Instead, he concentrated on trying to distinguish *Player.* In his denial to the return, petitioner, now represented by an attorney, again relied primarily on *Player.* He did not attempt either to challenge or to distinguish section 3375.4, subdivision (a)(3)(B). He simply ignored it. The superior court relied solely on *Player* in granting relief.

 Petitioner contends the Attorney General has forfeited the right to defend section 3375.4, subdivision (a)(3)(B), against a constitutional challenge because he did not do so in the superior court. But similar reasoning would lead to the conclusion that petitioner may not now challenge that section because *he* did not do so in the superior court. It cannot be the case that petitioner may challenge, but the Attorney General may not defend, the regulation for the first time on appeal. In fact, we have "allowed parties to ' "advance new theories on appeal when the issue posed is purely a question of law based on undisputed facts, and involves important questions of public policy." ' " (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1090, fn. 11 [72 Cal.Rptr.3d 112, 175 P.3d 1170], quoting *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 6 [74 Cal.Rptr.2d 248, 954 P.2d 511].) Because *Player, supra,* 146 Cal.App.4th 813, a published Court of Appeal decision, was binding on the superior court (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]), it made sense for the parties to litigate in the superior court whether *Player* applied rather than whether it was correct. The Court of Appeal was a logical place to litigate *Player*'s correctness, which necessarily included litigating section 3375.4, subdivision (a)(3)(B)'s validity. (See *Cedars-Sinai Medical Center v. Superior Court, supra,* at p. 6.) Accordingly, we will permit petitioner to challenge, and the Attorney General to defend, section 3375.4, subdivision (a)(3)(B).

■ Citing *People v. McKee* (2010) 47 Cal.4th 1172 [104 Cal.Rptr.3d 427, 223 P.3d 566], petitioner argues that the question of section 3375.4, subdivision (a)(3)(B)'s validity involves disputed facts—specifically, whether it is rational to consider as a classification factor actual work performance rather than mere willingness to work. He argues the Court of Appeal erred, indeed, even violated his constitutional rights, in resolving the question without an evidentiary record. In *McKee*, this court held that an evidentiary hearing was needed to resolve an equal protection challenge to a statute that was subject to strict scrutiny. (*People v. McKee, supra*, at pp. 1206–1211.) The due process issue here is whether section 3375.4, subdivision (a)(3)(B), is *rational*. *McKee* specifically limited its holding to classifications subject to strict scrutiny; it does not extend to statutes or regulations subject only to review for rationality. (*People v. McKee, supra*, at p. 1211, fn. 14.) Whether a statute or regulation is rational is, as a general rule, a legal question for the courts to resolve, not a factual question requiring an evidentiary hearing. In conducting rational-basis equal protection analysis, " 'a legislative choice is not subject to courtroom factfinding and may be based on rational speculation *unsupported by evidence or empirical data.*' " (*Warden v. State Bar* (1999) 21 Cal.4th 628, 650 [88 Cal.Rptr.2d 283, 982 P.2d 154], quoting *FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 315 [124 L.Ed.2d 211, 113 S.Ct. 2096], italics added in *Warden*.) We believe the same rule should apply to a due process challenge asking whether the regulation is rational. Accordingly, we agree with the Court of Appeal in rejecting petitioner's forfeiture argument: "The proposition that, as a general matter, an inmate who performs at average or above average level in a work, school, or vocational program requires less security than other inmates is not a question of historical fact that had to be determined based on evidence presented in this case. Thus, we do not become the trier of fact by considering that proposition on appeal."

■ In addition to his due process argument, petitioner invokes other constitutional, statutory, and regulatory provisions. He contends that section 3375.4, subdivision (a)(3)(B), also violates equal protection guarantees under both the United States and California Constitutions. This case involves neither a suspect class nor a fundamental interest. (See *Warden v. State Bar, supra*, 21 Cal.4th at pp. 640–643.) Accordingly, the classification will be upheld if there is a rational basis for it. (*Ibid.*) ■ The classification distinguishing between those who are willing to work but are unassigned through no fault of their own, and those who actually work, has a rational basis. Our conclusion that section 3375.4, subdivision (a)(3)(B), is not arbitrary, nor capricious, nor irrational—the test we applied in finding the section comports with due process—necessarily also means that it is rational.

Because an inmate may receive "S" time credit for "[a] temporary interruption or delay in the inmate's assignment which is no fault of the inmate" (§ 3045.3, subd. (b)(13)), petitioner claims it is irrational to distinguish

between inmates who are unassigned and those who are assigned but whose actual performance is temporarily interrupted or delayed. It is not clear whether the rules regarding classification credits under section 3375.4, subdivision (a), are similar to this "S" time rule. But in any event, the department can rationally distinguish between an inmate who is not assigned to a program at all and one who is assigned to a program but has some excused absences. An inmate may receive classification reduction points only for a "six-month period with an average or above performance" in a work program. (§ 3375.4, subd. (a)(3).) Thus, an inmate who is assigned to a program but never actually works (the situation petitioner posits) would presumably not receive the point reduction. An inmate who is assigned to a program and temporarily missed some work—but is nevertheless found to have performed overall at an average or above level—will have a record of working, which would aid the department in determining how much of a security risk the inmate is.

Petitioner also invokes Penal Code section 2600, which provides that an inmate confined in a state prison may "be deprived of such rights, and only such rights, as is reasonably related to legitimate penological interests." It is not clear exactly which right not reasonably related to legitimate penological interests petitioner claims he is being denied. Certainly, noninmates have a right not to be classified under Penal Code section 5068 and, in that sense, subjecting inmates to such classification deprives them of that right. But classifying inmates is obviously, and reasonably, related to legitimate penological interests. Penal Code section 2600 does not make Penal Code section 5068 invalid. Petitioner does not appear to assert otherwise. To the extent petitioner argues that by violating some *other* right, the classification decision of this case also violated Penal Code section 2600, the argument adds nothing to those already considered. Finally, petitioner argues that the department violated its own regulations, specifically section 3375, subdivision (f)(7), which requires that the classification decisions "be based on evaluation of available information." He claims that because he was unassigned during the period in question, "his performance in that job or program is information that is 'unavailable.' " We disagree. The fact that petitioner did not actually work during that time period—the critical fact under section 3375.4, subdivision (a)(3)(B)—is available information.

■ For these reasons, we conclude the department properly applied section 3375.4, subdivision (a)(3)(B), to deny petitioner the two-point reduction in his classification score at issue here. The Court of Appeal in this case correctly so held. We disapprove *In re Player, supra,* 146 Cal.App.4th 813, to the extent it is inconsistent with this opinion.

### III. CONCLUSION

We affirm the judgment of the Court of Appeal.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

Respondent's petition for a rehearing was denied December 1, 2010.