Filed 6/18/24  P. v. Louvier CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>RONNIE LOUVIER,<br><br>    Defendant and Appellant. | A166512<br><br>(San Francisco City & County Super. Ct. No. SCN207079, No. CRI02388429) |

A jury found defendant Ronnie Louvier guilty of second-degree murder (Pen. Code, § 187)[1] and firearm and drug possession offenses and found true that he personally used a firearm in the commission of the murder (§ 12022.53, subd. (d).)  He was sentenced in 2010 to 43 years to life in prison, including a term of 25 years to life for the firearm enhancement, and this court affirmed on appeal.  (*People v. Louvier* (Apr. 27, 2012, A127955) [nonpub. opn.] (*Louvier*).)  In 2022, the People moved to recall defendant's sentence and resentence him pursuant to the amendment of section 1385 by Senate Bill No. 81 (2021–2022 Reg. Sess.) (Senate Bill 81).  The court granted the motion in part, striking the sentence on the firearm enhancement under

_____

[1]    Further unspecified statutory references are to this code.

1

section 12022.53, subdivision (d), and replacing it with a term of 10 years to life under section 12022.53, subdivision (b).

Defendant asserts two main claims of error on appeal. First, he argues that section 1385, subdivision (c)(2)(C) (hereafter section 1385(c)(2)(C)) mandated dismissal of the firearm enhancement because it would result in a sentence of over 20 years, or alternatively, that the statute established a presumption in favor of dismissal that was not rebutted in this case. Second, defendant contends the trial court should have held a hearing to determine the admissibility of rap lyrics pursuant to Evidence Code section 352.2, which became effective during this appeal and, according to defendant, applies retroactively to this case. We reject his contentions and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

The People filed an information accusing defendant of the murder of Marquis Washington. (§ 187, subd. (a), count 1.) The People also accused defendant of participation in a criminal street gang (§ 186.22, subd. (a), count 2); possession of a firearm by a person under 30 (§ 12021, subd. (e), count 3); possession of a controlled substance with a firearm (Health & Saf. Code, § 11370.1, subd. (a), count 4); and possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a), count 5). Further, the information alleged defendant personally discharged a firearm (§ 12022.53, subd. (d)) in the commission of count 1, committed the offenses charged in counts 1 and 3 for the benefit of a street gang (§ 186.22, subd. (b)(1)(C)) and committed all

---

[2]    This background is adapted from the prior unpublished decision in the direct appeal, *People v. Louvier* (Apr. 27, 2012, A127955) [nonpub. opn.], and from the appellate record in *Louvier*, of which we take judicial notice on defendant's request. Additional facts relevant to the contentions on appeal are set forth in the corresponding sections of the Discussion, *post*.

offenses while on bail (§ 12022.1). (*Louvier*, *supra*, (Apr. 27, 2012, A127955) [nonpub. opn.].)

Washington died from a bullet to the head in a drive-by shooting at the intersection of Gough and Turk Streets in San Francisco at around 8:00 p.m. on March 20, 2008. (*Louvier*, *supra*, (Apr. 27, 2012, A127955) [nonpub. opn.].) Witness A.V., who was walking with Washington, saw a black car with tinted windows drive by and then return with the driver's side window cracked open. A.V. heard gun shots and saw flashes of light from the car before seeing Washington on the ground.[3] Another witness heard the shots, saw a black Camaro leave the scene, wrote down the license plate number of the car, and gave it to the police. Utilizing the information provided by the witness, police traced the vehicle to defendant, who lived with his aunt in San Leandro at that time. (*Louvier*, *supra*, (Apr. 27, 2012, A127955) [nonpub. opn.].)

On the morning after the shooting, police observed defendant cleaning the driver's side window on the Camaro and apprehended him as he was getting into the vehicle. After taking him into custody, police tested for, and found, gunshot residue on defendant's hands. Police found a hidden compartment in the dashboard of the Camaro containing a Glock semi-automatic pistol loaded with nine .9 mm Luger RP cartridges, as well as a quantity of rock cocaine. No fingerprints were found on the gun. DNA testing showed defendant was a major donor of the DNA found on the weapon. Police also searched defendant's bedroom at his aunt's house and recovered a box of Remington cartridges with several cartridges missing from the box. Ballistics evidence showed that the bullets found at the scene of the

---

[3]    At trial, A.V. testified that he could not identify the shooter. He would later state in postjudgment proceedings that defendant was not the shooter.

crime were fired from the Glock semi-automatic found in the Camaro and that the head stamps on the bullets found at the scene matched those found on the box of ammunition seized in defendant's bedroom. (*Louvier*, *supra*, (Apr. 27, 2012, A127955) [nonpub. opn.].)

Defendant took the stand at trial. He denied any involvement in the shooting but testified that he was in San Francisco on the day of the shooting and that his car was towed. He retrieved his car around 4:00 p.m. and then went to a barber shop where he met his friend Charles Heard, who asked if he could borrow defendant's Camaro. Defendant agreed on the condition Heard return the vehicle to San Leandro later that night. Defendant took BART back to San Leandro, arriving home shortly after 7:00 p.m. Heard returned the Camaro about 10:30 p.m. and warned defendant to wipe the car because " 'some shit went down.' " Defendant testified that the Glock found in the Camaro did not belong to him, he had never touched it, and he did not know how his DNA got on the gun. He also denied any knowledge of the box of cartridges found in his bedroom and the cocaine found in the vehicle. (*Louvier*, *supra*, (Apr. 27, 2012, A127955) [nonpub. opn.].)[4]

The jury ultimately found defendant guilty of second-degree murder as charged in count 1, and found true the allegations that he personally discharged a firearm in the commission of the offense and committed the offense while on bail. The jury also returned guilty verdicts on the firearm and drug offenses charged in counts 3–5 and found true the allegation defendant committed those offenses while on bail. However, the jury found

---

[4]    During the investigation, Heard was excluded as a contributor to the DNA found on the steering wheel of the Camaro, while defendant was found to be the major donor. Heard was also excluded as a donor to the sample swabs taken from the interior of the Camaro and on the Glock pistol found in the Camaro.

4

the allegation that defendant committed the murder for the benefit of a street gang not true and acquitted him of participating in a criminal street gang as alleged in count 2.

In February 2010, the trial court sentenced defendant to an indeterminate term of 43 years-to-life in state prison. The judgment was affirmed on direct appeal. (*Louvier*, *supra*, (Apr. 27, 2012, A127955) [nonpub. opn.].)

In February 2022, the People moved to recall defendant's sentence and resentence him pursuant to former section 1170.03 (renumbered section 1172.1). The motion was based on the recommendations of the San Francisco District Attorney's Innocence Commission (Innocence Commission) and on defendant's "positive post-conviction conduct," which demonstrated "he no longer presents a public safety risk such that his confinement is no longer in furtherance of justice."

As the People recounted in the motion, defendant filed several petitions for postconviction relief, including a 2015 petition for writ of habeas corpus based on a declaration from witness A.V. stating, contrary to his trial testimony (see fn. 3, *ante*), that he had seen enough of the shooter to identify him as a light-skinned male and not defendant. At a 2017 evidentiary hearing on the petition, A.V. claimed he was pressured by police officers to falsely identify defendant as the shooter, and so he testified at trial that he could not identify the shooter. The trial court denied the habeas petition, finding A.V.'s testimony to not be credible. Defendant filed a second habeas petition presenting additional new evidence, and at the time of the People's resentencing motion, the trial court had issued an order to show cause on the petition.

5

The People argued that during defendant's incarceration thus far, he had established a positive record of rehabilitation, earned "laudatory 'chronos' for participating in extensive self-help programming and cognitive behavioral therapy, maintained an acceptable disciplinary record, and continued to engage positively in his education." He committed "few" rules violations and had a security classification score (CS) of 51, which reflected his "few, non-violent rule violations over the past several years, but represent[ed] a substantial improvement (a decrease of 20 points) since [defendant's] earliest available CS score from 2014." His California Static Risk Assessment (CSRA) score was 1, "the best possible score he could obtain, revealing a low risk of recidivating."

The People further argued that circumstances had changed since defendant's original sentencing, as he was 22 years old at the time of the shooting and was now 37 years old, and that the Innocence Commission's investigation "undermine[d] the People's confidence" in the second-degree murder conviction. The People additionally provided details on defendant's reentry plan and community support network.

The trial court held an initial hearing in May 2022, and put the matter over to August 15, 2022, for decision. At the August 15 hearing, the People requested a continuance due to the case having been reassigned at the District Attorney's Office. The court continued the matter, and at the continued hearing on August 19, began by asking whether the People were withdrawing the petition in light of the reassignment of the case. The People requested an additional continuance, but the court remarked it was not considering defendant's claim of innocence and prior habeas petitions, "which have been denied after hearing, denied at the Court of Appeal, denied at the California Supreme Court." The court clarified it was only "looking at his

6

performance" and "whether or not he fits the description of someone who represents an unreasonable risk to reoffend violently, as defined if released at this point." As such, the court did not "believe that there's any need for a continuance at this time" and proceeded to the merits of the motion.

Despite having brought the original resentencing motion, the People now argued they were "concerned for public safety. We are concerned because of the lack of remorse and the exceptions of [*sic*] responsibility by the defendant, which we feel is necessary for rehabilitation." Defendant's counsel argued that his client had shown remorse, engaged in substantial programming, and had strong community support and a robust release plan, and therefore qualified for resentencing.

The trial court acknowledged that defendant "has most recently been doing better in custody. He currently has an institutional security score of 51, his lowest could be 19, so he's got a relatively high score." As for defendant's CSRA score, the court noted that his "score of one is the lowest," but "[t]hat instrument moderately predicts recidivism. And recidivism, within three years on that model, is as high as 40 percent. So low is a relative term, as to that instrument."

The trial court highlighted defendant's 2019 "rules violation for his girlfriend inappropriately touching him in a visiting room; 2020, possession of a cell phone; 2019, getting tattooed; and 2013, somewhat more remotely, having a cell phone." Acknowledging these rules violations were nonviolent, the court nonetheless found they demonstrated defendant's attitude that "the rules don't apply to him."

As to defendant's maintaining of innocence, the trial court stated it was "not going to hold that against him in any way, despite the fact that numerous [courts] have turned down his bid, even after taking new

evidence," because guilt or innocence "was not what the Court's here to determine." The court recognized that despite his claim of innocence, defendant was gaining more insight and "moving toward a position where he's able to better articulate" his role in the shooting.

The trial court further noted that defendant was a young man at the time of the shooting, and that at 37 years old, he was "still relatively young. Looks like he's started doing some positive work in groups, but not until 2018. It took him a while before he got involved in groups. There may have been reasons for that, but I don't really see much participation, if any, very little, before then." In the court's view, defendant was "someone who is becoming less dangerous, is starting to acknowledge his role in the death of the decedent in this case, and is starting to do a little bit better. And I also do see someone who has good community resources and people that care about him." However, the court also found that defendant "continues to represent an unreasonable risk to the public in that he might commit . . . a violent offense as defined by the statute."

Based on its findings, the trial court refused to dismiss the term of 15 years to life on count 1. However, the court struck the term of 25 years to life for the firearm enhancement under section 12022.53, subdivision (d), on count 1 and replaced it with a term of 10 years to life under section 12022.53, subdivision (b). The court also modified the 3-year sentence on count 4 to run concurrently rather than consecutively. In sum, the court resentenced defendant to a total of 25 years to life, rather than the original sentence of 43 years to life. The court explained that its decision "reflects putting [defendant] in custody for a longer period of time, where he'll start to get into a demographic area where demonstratively his risk level will drop, and I think it will also give him an opportunity to continue his path on reflecting on

8

his involvement in the kind of offense that got him in prison, and avail himself of the programming that he seems to have just started."

Defendant moved for reconsideration, arguing that section 1385(c)(2)(C) required dismissal of the firearm enhancement because it would result in a sentence of greater than 20 years, and that the trial court failed to give great weight to defendant's status as a youthful offender (under the age of 26 at the time of the offense). The court denied reconsideration.

Defendant timely appealed from the trial court's denials of the resentencing and reconsideration motions.

**DISCUSSION**

**A. Dismissal of Sentencing Enhancements**

Under section 12022.53, subdivision (h), "[t]he court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section." The court may also impose a lesser included, uncharged section 12022.53 enhancement if facts supporting imposition of the lesser enhancement have been alleged and found true. (See *People v. Tirado* (2022) 12 Cal.5th 688, 697.)

In 2021, the Legislature enacted Senate Bill 81, "which amended section 1385 to specify mitigating circumstances that the trial court should consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice." (*People v. Lipscomb* (2022) 87 Cal.App.5th 9, 16 (*Lipscomb*).)

Section 1385 provides in relevant part: "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." (§ 1385, subd. (c)(1).) "In exercising its discretion under

9

this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (§ 1385, subd. (c)(2).) One such mitigating circumstance is that "[t]he application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed." (§ 1385(c)(2)(C).)

### 1. *Mandatory Versus Discretionary Dismissal*

Defendant argues section 1385(c)(2)(C) mandates dismissal of the firearm enhancement under section 12022.53, subdivision (d), because the enhancement could result in a sentence of over 20 years. Appellate courts have unanimously rejected this argument, concluding that the "shall be dismissed" language found in section 1385, subdivision (c)(2)(B) and (C), when read in context with the statutory framework as a whole, does not categorically mandate dismissal of an enhancement whenever any of the statutorily listed mitigating circumstances is shown. (See *People v. Mendoza* (2023) 88 Cal.App.5th 287, 294–297 (*Mendoza*); *People v. Anderson* (2023) 88 Cal.App.5th 233, 239, review granted Apr. 19, 2023, S278786 (*Anderson*); *Lipscomb*, *supra*, 87 Cal.App.5th at pp. 17–21; *People v. Walker* (2022) 86 Cal.App.5th 386, 396–398, review granted Mar. 22, 2023, S278309 (*Walker*).)

As explained in *Mendoza*, the "shall be dismissed" language of section 1385(c)(2)(C) cannot be read in isolation, and the statutory language as a whole supports the interpretation that "if the court finds that dismissal of an

enhancement 'would endanger public safety,' then the court need not consider the listed mitigating circumstances. [Citation.] The 'shall be dismissed' language in section 1385(c)(2)(C), like the language of all of the mitigating circumstances, applies only if the court does *not* find that dismissal of the enhancement would endanger public safety." (*Mendoza*, at p. 296.) *Mendoza* further reasoned that the defendant's interpretation—like defendant's here— would lead to an absurd result because the trial court would be required to dismiss an enhancement even when it has found that dismissal would endanger public safety. (*Ibid*.; see also *Anderson*, *supra*, 88 Cal.App.5th at pp. 239–240 [refusing to consider the "shall be dismissed" language "in isolation" and concluding "a finding of danger to public safety can overcome the circumstances in favor of dismissal"].) And as the court in *Lipscomb* similarly reasoned, it would be "absurd" to construe such language as mandating dismissal in the context of a 25-year-to-life firearm enhancement under section 12022.53, subdivision (d), because then "this enhancement could never be imposed under any circumstances" including where trial court expressly found endangerment to public safety. (*Lipscomb*, *supra*, 87 Cal.App.5th at pp. 20–21.)

Defendant notes we are not bound by the published decisions of other appellate districts. (See *Jessen v. Mentor Corp.* (2008) 158 Cal.App.4th 1480, 1489, fn. 10.) Even so, we agree with their reasoning and join them in concluding that dismissal of the firearm enhancement was not compelled simply because the enhancement would result in a sentence over 20 years.[5]

---

[5] In light of the trial court's finding that dismissal of the firearm enhancement would endanger public safety, we need not decide how the "shall be dismissed" language in section 1385(c)(2)(C) would operate if the court had *not* found that dismissal would endanger public safety. (See *Mendoza*, *supra*, 88 Cal.App.5th at p. 297 & fn. 6.)

Defendant's attempts to persuade us otherwise are unavailing. He criticizes *Anderson* and *Lipscomb* for basing their legislative history analyses on a September 10, 2021, letter by the author of Senate Bill 81 that *postdated* the bill's passage. In our view, however, those courts' reliance on Senator Skinner's letter was secondary to their analysis of the statutory language, and *Mendoza* and *Walker* reached the same conclusion without resort to Senator Skinner's letter. We do likewise.

Relying on the principle of statutory construction that " 'the specific controls over the general,' " defendant contends section 1385(c)(2)(C)'s "shall be dismissed" language controls over the more generalized considerations of public safety and the furtherance of justice in the statute. We cannot agree. We are not presented here with a conflict between two different statutes, one specific and the other general. (See *Estate of Kramme* (1978) 20 Cal.3d 567, 576 [specific statute covering particular subject controls and takes priority over general statute encompassing same subject].) Rather, we are presented with two parts of the *same* statutory subdivision. The guiding principle in this endeavor is to harmonize the parts of the statute, not to consider a single part in isolation from the other. (See *Mendoza*, *supra*, 88 Cal.App.5th at p. 294.)

Defendant also invokes the rule of lenity, which has been stated as follows: " 'If the statutory language is ambiguous and susceptible of two plausible interpretations, we must, because this is a criminal statute, adopt the one more favorable to the defendant.' " (*People v. Lamb* (1999) 76 Cal.App.4th 664, 682.) But adoption of defendant's construction of section 1385(c)(2)(C) would mean that a firearm enhancement under section 12022.53, subdivision (d), which necessarily increases a sentence to over 20 years, must always be dismissed, even if the court finds that dismissal would

endanger public safety. Because that is not a plausible construction of section 1385 (see *Mendoza*, *supra*, 88 Cal.App.5th at p. 296; *Lipscomb*, *supra*, 87 Cal.App.5th at pp. 20–21), the rule of lenity does not apply.

For the foregoing reasons, we reject defendant's contention that dismissal of the firearm enhancement under section 12022.53, subdivision (d), was mandated under section 1385(c)(2)(C).

### 2. *Rebuttable Presumption*

Defendant alternatively contends section 1385(c)(2)(C) creates a rebuttable presumption that an enhancement that will cause a sentence to exceed 20 years cannot be imposed absent substantial evidence of endangering public safety that rebuts the presumption. Notably, the appellate courts are currently split on this issue, which is under review in the Supreme Court.

In *Walker*, the Court of Appeal held that "section 1385's mandate to 'afford great weight' to mitigating circumstances erects a rebuttable presumption that obligates a court to dismiss the enhancement unless the court finds that dismissal of that enhancement—with the resultingly shorter sentence—would endanger public safety." (*Walker*, *supra*, 86 Cal.App.5th at p. 391, review granted Mar. 22, 2023, S278309.) In *Walker*'s view, "the term 'great weight' places a thumb on the scale that balances the mitigating circumstances favoring dismissal against whether dismissal would endanger public safety, and tips that balance in favor of dismissal unless rebutted by the court's finding that dismissal would endanger public safety." (*Id.* at pp. 399–400.)

In *People v. Ortiz* (2023) 87 Cal.App.5th 1087, review granted April 12, 2023, S278894 (*Ortiz*), the appellate court rejected the argument that the language of section 1395, subdivision (c)(2)(B) "warranted a presumption in

favor of dismissal that could only be rebutted by a showing that dismissal would endanger public safety." (*Ortiz*, at p. 1096.)  In *Ortiz*'s view, the final language of Senate Bill 81 "reflects a legislative recognition that a trial court's exercise of sentencing discretion involves more than a strictly binary weighing of mitigation against public safety" and includes consideration of generally applicable sentencing principles such as the defendant's background, character, and prospects. (*Ortiz*, at p. 1097.)  "Those principles require consideration of circumstances in mitigation (and aggravation) in the broader context of the recognized objectives of sentencing, which are not limited to public safety." (*Ibid.*)  As such, *Ortiz* "decline[d] to follow *Walker* in its more formalistic reading" of section 1385, subdivision (c)(2). (*Ortiz*, at pp. 1097–1098.)

We need not weigh in on this split, as the trial court here found that dismissal of the firearm enhancement would endanger public safety.  Thus, even if *Walker*'s holding proves to be the correct formulation of section 1385, subdivision (c)(2), the presumption in favor of dismissal in this case was rebutted by the court's finding of endangerment to public safety.

### 3. *Abuse of Discretion*

Defendant argues the trial court abused its discretion in refusing to dismiss the firearm enhancement because the record shows his rehabilitation history, engagement in programming, and CS and CSRA scores were " 'all extremely favorable' " and supported his "low risks for violence."  We disagree.

We review a trial court's decision not to strike a sentence enhancement under section 1385 for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 373– 374 (*Carmony*).)  An abuse of discretion may occur where the trial court is not aware of its discretion, considers impermissible factors,

14

fails to consider relevant factors, or where the decision is so irrational or arbitrary that no reasonable person could agree with it. (*Carmony*, at pp. 377–378.) "The court is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary." (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.)

"[S]ection 1385(c)(2) does not require the trial court to consider any particular factors in determining whether 'there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others.'" (*Mendoza, supra*, 88 Cal.App.5th at p. 299.) Here, the record reflects that the trial court considered, among other factors, defendant's CS score of 51. "California prison inmates are classified pursuant to a scoring system that determines their prison custody level. [Citation.] A higher score means the inmate is considered a higher security risk and would be assigned to a correspondingly higher security facility; a lower score means the inmate is considered a lower security risk and would be assigned to a correspondingly lower security facility. . . . Among the factors considered in this annual review is the inmate's participation in a work, school, or vocational program." (*In re Jenkins* (2010) 50 Cal.4th 1167, 1171.) Here, the trial court concluded that defendant's CS score of 51 was sufficiently above the lowest possible score of 19 to constitute "a relatively high score," and we see nothing unreasonable in this view. Accordingly, it was not unreasonable for the court to be concerned that corrections authorities still assessed defendant with an elevated security risk score.

The trial court also appropriately considered defendant's record of rehabilitative programming, which we acknowledge is commendable. However, the court emphasized that defendant's engagement was relatively recent. This finding is supported by the record, which reflects that despite

15

being sentenced in 2010, defendant's participation and completion of various courses started in or around 2018. On this record, the court could reasonably conclude that defendant still required more time to participate in beneficial programming before it could say that dismissal of the firearm enhancement would not likely endanger public safety. Indeed, the court's decision to reduce the enhancement from 25 years to 10 reflected a reasonable balancing of defendant's success to date with realistic concerns that his rehabilitation was still a work in progress.

Defendant faults the trial court for refusing to consider his innocence claims but cites no authority that required the court to do so. Granted, this case took some unique turns, as the effort to resentence defendant was initiated by the People based on the recommendations of the Innocence Commission before an internal reassignment of the case at the District Attorney's Office resulted in the People's change of course. At the same time, the trial court was correct that defendant's innocence claims had been repeatedly rejected by several courts in collateral postjudgment proceedings. On this record, we cannot say the court acted unreasonably or arbitrarily in relying on conventional resentencing factors rather than importing defendant's innocence claims into its analysis.

We credit defendant's point that all of the rules violations cited by the trial court were nonviolent. We also note the court seemed to give short shrift to defendant's low CSRA score, concluding (without reference to any evidence in the record) that the CSRA only "moderately predicts recidivism." But these points do not establish that the court's decision was so irrational or arbitrary that no reasonable person could agree with it. (*Carmony*, *supra*, 33 Cal.4th at pp. 377–378.) In evaluating the court's decision, we may reasonably infer that the court's concerns about defendant's potential for

16

recidivating were informed by the nature of his offense, in addition to the factors already discussed. (See *People v. Pearson* (2019) 38 Cal.App.5th 112, 117 [factors to consider when determining whether to strike firearm enhancement are same as when handing down sentence in first instance, including that crime involved great violence, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness].) In the instant case, the offense was a drive-by shooting of the victim in cold blood. In light of this violent and callous crime involving the use of a firearm, defendant's "relatively high" institutional risk score of 51, and the relative recency of his engagement in rehabilitative programming, we cannot say the court acted arbitrarily or unreasonably in concluding that complete dismissal of the firearm enhancement at the time of the resentencing motion posed a likely danger to public safety.

For all of these reasons, we conclude defendant fails to demonstrate the trial court erred in refusing to dismiss the firearm enhancement.

## B. Evidence Code Section 352.2

Defendant contends Evidence Code section 352.2 applies retroactively and requires the matter to be remanded for a hearing to consider the admissibility of rap lyrics that were admitted at trial. We conclude the statute does not apply retroactively to this case, and that even if it did, defendant fails to show he was prejudiced by any assumed error.

### 1. *Additional Background Facts*

During the police investigation, officers searched defendant's bedroom in his aunt's San Leandro residence and found, in addition to the box of Remington cartridges, a notebook with rap music lyrics written by defendant.

At trial, defendant requested an Evidence Code section 402 hearing to challenge the prosecution's gang expert, San Francisco Police Officer Damon

17

Jackson. The court permitted Officer Jackson to testify as an expert on gang activity in the Fillmore/Western Addition area of San Francisco. Officer Jackson testified as to his familiarity with the "Eddy Rock" and "800 Block" gangs. He noted the lyrics found in defendant's bedroom referred to defendant's street and stage name, "Ron Ruge," and his affiliation with the 800 Block gang. Jackson also noted the lyrics described defendant as a "big powerful animal[]," a " 'predator,' " and a " 'beast' " who used a Glock pistol. Jackson testified that "to some extent the rap music that we retrieved and we've listened to regarding Western Addition gangs is art," but that "a lot of what they talk about is true." In Jackson's view, "celebrating murders is not artistic" and "is meant to enrage" rival gang members and associates. Jackson opined that the specific references to real locations, people, and events in defendant's lyrics were "outside of the art or expression part of the song."

Defendant denied he was a member of the 800 Block gang and testified that Officer Jackson misinterpreted the rap lyrics he had written. Defendant explained that when he talked about murder or violence in his music, he was not doing so because he had committed these acts, but because rapping allowed him to "be whatever you want to be." According to defendant, his lyrics came from a variety of sources, including motion pictures and "things I hear on the streets," and gangster rap "is just artistic expression" and a way of "paint[ing] pictures with words" with the ultimate goal of making money.

### 2. *Retroactivity*

Effective January 1, 2023, Assembly Bill No. 2799 (2021-2022 Reg. Sess.) added Evidence Code section 352.2 to California law. (Stats. 2022, ch. 973, § 2.) The Legislature's intent was to "provide a framework by which courts can ensure that the use of an accused person's creative expression will

18

not be used to introduce stereotypes or activate bias against the defendant, nor as character or propensity evidence; and to recognize that the use of rap lyrics and other creative expression as circumstantial evidence of motive or intent is not a sufficient justification to overcome substantial evidence that the introduction of rap lyrics creates a substantial risk of unfair prejudice." (Stats. 2022, ch. 972, § 1, subd. (b).)

The statute provides that "[i]n any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under Section 352, shall consider, in addition to the factors listed in Section 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings." (Evid. Code, § 352.2, subd. (a).)[6]

---

[6] Evidence Code section 352.2 also requires the trial court to consider, if proffered and relevant, credible testimony that provides social or cultural context on the creative expression evidence; experimental or social science research on the potential for racial bias through the admission of creative expression evidence; and any evidence to rebut such research or testimony. (Evid. Code, § 352.2, subd. (b).) Admissibility of creative expression evidence must be heard in limine and determined by the court outside the presence of the jury pursuant to Evidence Code section 402, and the court must state its ruling and reasons on the record. (*Id.*, subd. (d).)

The appellate courts of this state are split as to whether Evidence Code section 352.2 applies retroactively to nonfinal cases on appeal. (Compare *People v. Venable* (2023) 88 Cal.App.5th 445, review granted May 17, 2023, S279081 (*Venable*) [Evid. Code, § 352.2 has ameliorative effect and thus applies retroactively to nonfinal cases] with *People v. Ramos* (2023) 90 Cal.App.5th 578, 592–596, review granted July 12, 2023, S280073 (*Ramos*) [Evid. Code, § 352.2 is not retroactive]; *People v. Slaton* (2023) 95 Cal.App.5th 363, 372–376, review granted November 15, 2023, S282047 (*Slaton*) [same].)

We agree with *Ramos* and *Slaton* and adopt their reasoning and conclusions. The general rule is that in the absence of indications of contrary legislative intent, it will be presumed that a statute is intended to operate prospectively; but " 'amendatory statutes that lessen the punishment for criminal conduct are ordinarily intended to apply retroactively.' " (*Ramos*, *supra*, 90 Cal.App.5th at p. 593, citing *In re Estrada* (1965) 63 Cal.2d 740, 744–745 (*Estrada*).) In disagreeing with *Venable*'s conclusion that Evidence Code section 352.2 should apply retroactively as an ameliorative enactment within the meaning of *Estrada*, *Ramos* reasoned that, although the statute "may, in many instances, end up being beneficial to a criminal defendant in that it may result in the exclusion of evidence favorable to the People, it is not a statute that creates the possibility of lesser punishment or any other type of more lenient treatment. It is also not a statute that reduces criminal liability, such as by altering the substantive requirements for a conviction or expanding a defense." (*Ramos*, *supra*, 90 Cal.App.5th at pp. 595–596 (italics omitted).)

*Slaton* similarly concluded that Evidence Code section 352.2 is not retroactive because it does not "alter the punishment or other consequences for an offense," "reduce the possible punishment for an offense," or "change

20

the substantive offense or penalty enhancement for any crime." (*Slaton, supra*, 95 Cal.App.5th at pp. 372–373.) In the words of the *Slaton* court, the statute "is instead a new evidentiary rule intended to prevent trial courts from admitting a person's creative expression without first properly evaluating the negative consequences of doing so. And it is a neutral rule at that, limiting a defendant's ability to present a person's creative expression just as much as the prosecution's ability to present this type of evidence. To be sure, we expect the statute will tend to affect the prosecution's ability to present evidence more than a defendant's ability. And in some cases, no doubt, defendants will benefit from having adverse evidence excluded under section 352.2. But in other cases, the prosecution will instead be the beneficiary, as could be true, for instance, if a defendant attempted to falsely accuse another of a crime based on that person's poetry, rap lyrics, or other creative expression. Neutral evidentiary rules of this sort do not warrant *Estrada* treatment." (*Slaton*, at p. 373.)

We agree with *Ramos* and *Slaton* and conclude Evidence Code section 352.2 is not an ameliorative change to the criminal law entitled to retroactive application under the *Estrada* rule.

### 3. *Harmless Error*

Even assuming for the sake of argument that Evidence Code section 352.2 applies retroactively to this case, and that the trial court's admission of the rap lyrics violated the statute,[7] we conclude defendant has not sufficiently established prejudice.

---

[7] The People maintain there is a strong likelihood the rap lyrics would have been admissible under Evidence Code section 352.2 due to their similarities to the facts of this case—e.g., references to defendant's street name and the 800 Block gang, defendant's use of a Glock pistol, and the use of phrases like " 'man down' " and " 'Murder.' " Defendant argues a remand is

21

Because the routine application of the California Evidence Code does not implicate a criminal defendant's constitutional rights, we apply the state harmless error standard under *People v. Watson* (1956) 46 Cal.2d 818, asking whether it is reasonably probable that defendant would have obtained a more favorable result had the error not occurred. *(People v. Jones* (2013) 57 Cal.4th 899, 957.)

We do not find it reasonably probable that defendant would have obtained a more favorable result absent the rap lyric evidence. That the jurors acquitted defendant of the gang participation count and found the gang allegation on the murder count not true tends to dispel the inference that the jurors gave serious consideration to the lyrics' mention of murder, defendant's affiliation with the 800 Block gang, and his use of a Glock pistol.

Moreover, the record shows that defendant's guilt on the murder count was sufficiently established by evidence unrelated to the rap lyrics. The bullets found at the crime scene were fired from the Glock pistol found in defendant's Camaro (the same type of car a witness saw at the scene), and matched the bullets found in the box of ammunition seized from defendant's bedroom. Defendant had traces of gunshot residue on both hands and was a major contributor to the DNA on the gun (which he claimed to have never touched) and the Camaro's steering wheel and interior. Moreover, Heard was excluded as a suspect, as his DNA was not found on the gun or in the Camaro. On this record, which included abundant forensic evidence tying defendant to the murder weapon and vehicle used in Washington's murder,

---

necessary for the trial court to conduct a hearing on these matters in the first instance. We need not resolve this dispute in light of our conclusion that defendant has not established prejudice.

we see no reasonable probability that defendant would have obtained a more favorable result had evidence of the rap lyrics been excluded.

## DISPOSITION

The judgment is affirmed.

_____
Fujisaki, J.

WE CONCUR:


_____
Tucher, P.J.


_____
Petrou, J.

*People v. Louvier* (A166512)

23